

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-1994

# In re: Modular Structures, Inc.

Precedential or Non-Precedential:

Docket 92-5577

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"In re: Modular Structures, Inc." (1994). *1994 Decisions*. Paper 56.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/56

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 92-5577


IN RE:  MODULAR STRUCTURES, INC.

Debtor

FIRST INDEMNITY OF AMERICA INSURANCE COMPANY

Appellant

v.

MODULAR STRUCTURES, INC.;
FIRST FIDELITY BANK, N.A.

THEODORE LISCINSKI, ESQ.

Trustee


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 92-02024)


Argued July 2, 1993

Before: BECKER, ALITO and ROTH, Circuit Judges

(Opinion Filed June 23, 1994)


Armen Shahinian, Esquire (Argued)
Joseph Monaghan, Esquire
Wolff & Samson
5 Becker Farm Road
Roseland, NJ 07068
        Attorney for appellant

Stephen M. Packman, Esquire (Argued)
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033
          Attorney for First Fidelity Bank,
          National Association and Trustee

Robert W. McCann, Esquire
Klotz & McCann
649 Lafayette Avenue
P.O. Box 64
Hawthorne, NJ 07507
          Attorney for Amicus-appellant
          Surety Association of America


                    OPINION OF THE COURT



ROTH, <u>Circuit Judge</u>:

        This appeal arises from the Chapter 7 bankruptcy
proceedings of Modular Structures, Inc. ("Modular").  Prior to
filing for bankruptcy on March 8, 1991, Modular had contracted to
construct a new corporate headquarters in Newark, New Jersey, for
the Salvation Army.  First Indemnity of America Insurance Company
("First Indemnity") issued a bond to the Salvation Army to secure
Modular's performance and payment obligations under the contract.
Eleven months after the institution of the bankruptcy
proceedings, First Fidelity Bank ("the Bank"), as a secured
creditor of Modular, filed a Notice of Motion for Turnover of
Funds to obtain the unearned contract proceeds and retainage held
by the Salvation Army.  First Indemnity filed a cross-motion to

                                                              3

place the contract proceeds and retainage in escrow in order to assure that the funds remained available to secure Modular's obligations to pay subcontractors.  On March 2, 1992, the bankruptcy court denied First Indemnity's cross-motion and entered an Order Allowing Turnover in favor of the Bank.  First Indemnity appealed this decision to the district court which affirmed the bankruptcy court.

Because we conclude that the district court and the bankruptcy court incorrectly determined that the contract proceeds and retainage, which the Salvation Army was holding, were part of the estate in bankruptcy, we will reverse the order directing turnover to the Bank.  We also conclude that the bankruptcy court made an insufficient examination of whether Modular had any legal or equitable interest in the funds held by the Salvation Army.  We will therefore remand this issue to the bankruptcy court for further proceedings in this regard.

## I.

On February 27, 1989, Modular entered into a contract with the Salvation Army for the design and construction of a new corporate headquarters in Newark, New Jersey.  In accordance with the terms of the contract, First Indemnity, as surety, issued its Labor and Material Payment Bond and its Performance Bond to the Salvation Army, as obligee, to secure Modular's performance of the contract.  The bonds bound Modular and First Indemnity to pay

Modular's laborers and materialmen in connection with the contract, which was incorporated by reference into the bonds.[1]

In March 1989, the Bank loaned Modular the principal sum of $1.5 Million to enable Modular to undertake construction contracts such as the one with the Salvation Army. The Bank entered into a General Security Agreement whereby it took a security interest in all of Modular's accounts receivable, contracts and proceeds thereof. Modular also executed a Uniform Commercial Code Financing Statement which was filed on April 20, 1989, thereby perfecting the Bank's lien.

Modular commenced work on the Salvation Army project but was unable to complete all of its obligations under the contract. On March 8, 1991, Modular filed for protection under Chapter 7 of the United States Bankruptcy Code, and a Trustee was

---

[1]The surety on a construction surety bond guarantees to the owner that the contractor will finish the job. If the contractor defaults, the surety performs the work, mitigates loss by its performance, and pays the subcontractors and suppliers. In performing this function, the surety "stands in the shoes" of other parties to the construction project through use of the equitable doctrine of subrogation:

> [T]he surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and materialmen who have been paid by the surety -- who may have had liens; and not least, in the shoes of the government [owner], for whom the job was completed.

National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 847-49 (1st Cir. 1969).

appointed. Modular stated in its bankruptcy schedules that the Bank maintained a first, perfected security interest in Modular's accounts receivable and contracts and proceeds thereof. On August 5, 1991, the Bank obtained a consent order from the Trustee granting it a "Superpriority Lien" in Modular's account receivables. Following the consent order, the Bank pursued collection of Modular's accounts receivable.

First Indemnity contends that the unpaid contract proceeds and retainage held by the Salvation Army were not properly characterized as accounts receivable owing to Modular so that the Bank's superpriority lien would apply to them. Pursuant to Article 6 of the contract between Modular and the Salvation Army, the Salvation Army was not obligated to make final payment to Modular until: "(1) the Contract has been fully performed by the contractor except for the Contractor's responsibility to correct nonconforming work as provided in Subparagraph 12.2.2 of the General Conditions and to satisfy other requirements, if any, which necessarily survive final payment; and (2) a final Certificate for Payment has been issued by the architect . . .." App. at 79a. Article 9, section 1.2, of the Contract defined the "General Conditions" as the General Conditions of the contract for Construction, AIA Document A201, 1987 Edition. Those General Conditions included Article 3, section 4.1, which stated that the Contractor shall provide and pay for the labor, materials and equipment necessary for the proper completion of the work, as well as Article 9, section 3.1.2, which provided that a Contractor's application for payment "may not include requests

5

for payments of amounts the Contractor does not intend to pay to a Subcontractor or material supplier because of a dispute or other reason." App. at 96a, 104a. Article 9, section 5.1.3, permitted the Architect to withhold his certification for payment to the extent necessary to protect the Owner from loss as the result of the failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment. See app. at 105a.

> Additionally, Article 9, section 10.2, provided that:
> Neither final payment nor any remaining
> retained percentage shall become due until
> the Contractor submits to the Architect (1)
> an affidavit that payrolls, bills for
> materials and equipment, and other
> indebtedness connected with the Work for
> which the Owner or the Owner's property might
> be responsible or encumbered (less amounts
> withheld by Owner) have been paid or
> otherwise satisfied, . . . (4) consent of
> surety, if any, to final payment and (5) if
> required by the Owner, other data
> establishing payment or satisfactions of
> obligations, such as receipts, releases and
> waivers of liens, claims, security interests
> or encumbrances arising out of the Contract
> to the extent and in such form as may be
> designated by the Owner . . ..

App. at 106a. Finally, Article 14, section 2.1.2, provided that the owner might terminate the contract if the contractor "fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors." Article 14, section 2.2, further provided that upon such a termination, "the Contractor shall not be entitled to receive further payment until the Work is finished." See app. at 111a–112a. In sum, Modular was obligated

6

to pay its subcontractors before it could receive final payment from the Salvation Army.

It is undisputed that First Indemnity, as surety for Modular, has been called upon to pay proper claims of subcontractors. First Indemnity, therefore, sent a letter, dated April 2, 1991, to the Salvation Army explaining that it should issue no additional payments to Modular so that any remaining funds could properly be used to cure Modular's default. The Bank, on the other hand, contends that, despite Modular's apparent breach of its contract with the Salvation Army, a letter sent by Charles R. Kramer, Jr., Esq., counsel for the Salvation Army, to counsel for the Bank demonstrates that the Salvation Army considered the contract terms to have been satisfied. The letter stated, inter alia, that "The Army is prepared to pay the final installment of $104,490.00, but wishes to do so only if said payment will not expose The Army to duplicate payments." App. at 114r. First Indemnity interprets this letter as requiring that the funds held by the Salvation Army not be payable to Modular until and unless Modular fully performed its contract, including the payment of laborers and materialmen.[2]

_____

[2]We note that neither the bankruptcy court nor the district court cited this letter in its decision on the turnover order. Our reading of the clear language of the letter, in view of the contract language discussed above, leads us to conclude that, in view of the unpaid subcontractors, the Salvation Army would have been exposed to "duplicate payments" if it had released the funds to Modular. For that reason, we conclude that contract terms had not been satisfied and the Salvation Army was not obligated to release the funds to Modular.

On November 7, 1991, counsel for the Bank sent a letter to the Salvation Army threatening to institute legal action if the Salvation Army did not release the funds to the Bank by November 22, 1991. The Salvation Army did not comply and the Bank filed its motion for turnover of the funds in Modular's bankruptcy proceeding.

The bankruptcy court found for the Bank on the basis that the contract was not a public contract and therefore there was no trust fund to protect the funds, and it issued an Order for Turnover of the funds. App. at 241r. First Indemnity then appealed to the district court which affirmed the decision of the bankruptcy court. The district court considered whether under New Jersey law the funds should be construed to be held in trust for subcontractors and thus entitled to special priority in a bankruptcy proceeding. The district court concluded that no constructive trust for subcontractors was created by New Jersey common law and affirmed the decision of the bankruptcy court. App. at 343-44r.

## II.

The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. 157((b)(1) over this Chapter 7 bankruptcy proceeding. The district court had appellate jurisdiction pursuant to 28 U.S.C. § 158(a) to review the bankruptcy court's turnover order. This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d), 1291 to review the district court's affirmance of the turnover order. See In re Moody, 817 F.2d 365

8

(5th Cir. 1987) (turnover order entered by the bankruptcy court in an adversary proceeding is a "final" order).

This court accepts the findings of fact of the bankruptcy court unless clearly erroneous. The bankruptcy court's conclusions of law and the district court's decision are reviewed de novo. See J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66, 69 (3d Cir. 1989); In re Muncrief, 900 F.2d 1220, 1224 (8th Cir. 1990).

III.

As an initial matter, the Bank contends that First Indemnity did not preserve the issue in the district and bankruptcy courts of whether Modular had breached its contract with The Salvation Army and that, therefore, First Indemnity has waived its arguments based upon any alleged breach of contract. We disagree. First Indemnity's position consistently has been either that Modular defaulted on its obligations under the contract by failing to pay subcontractors and as a consequence was owed no money by the Salvation Army or alternatively that under New Jersey law those funds were held by the Salvation Army in constructive trust for the benefit of the subcontractors. The breach of contract basis for argument was presented to the bankruptcy court in First Indemnity's February 21, 1992, letter brief in opposition to the Bank's motion for turnover: "Thus, these contract monies never became part of the debtor's estate. The contractor defaulted and has therefore lost its right to these funds. . .." App. at 205r. First Indemnity repeated this

9

position at oral argument in its opposition to the turnover order. App. at 182a.

First Indemnity then argued before the district court that:

> There is no right of payment of retainage of the contract balance unless all of the subcontractors or suppliers have been paid in full. Only in that manner can it be stated that all parties have complied with their contractual obligations. A.I.A. contract forms, as used in the case herein, certify that all subcontractors and suppliers are paid in full before payment will be made from the owner.
>
> In the case herein, it is quite clear that many of the subcontractors and suppliers were not paid. . ..

App. at 294r. Moreover, in its reply brief to the district court, First Indemnity asserted that because of this alleged breach of contract the Bank was precluded from attaching the funds held by the Salvation Army. See app. at 204a–205a. We find, therefore, that there has been no waiver of this issue.

IV.

First Indemnity's primary argument on appeal is that, because Modular breached its contract with the Salvation Army, none of the funds held by the Salvation Army were owing to Modular and thus could not properly be considered part of the bankruptcy estate, subject to the Bank's lien and amenable to a turnover order. Based upon the record before us, we agree with First Indemnity and will reverse the decisions of the district

and bankruptcy courts.[3]  We therefore hold, as a matter of law, that, assuming the facts are as the present record indicates, the funds held by the Salvation Army are not properly part of the estate in bankruptcy.[4]

The filing of a bankruptcy petition creates an estate in bankruptcy.  This estate, pursuant to section 541(a)(1) of the Code, contains "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §541(a)(1).  "'Although section 541 [of the Bankruptcy Code] defines property of the estate, we must look to state law to determine if a property right exists and to stake out its dimensions.'"  Universal Bonding Ins. Co. v. Gittens & Sprinkle Enter., Inc., 960 F.2d 366, 369 (3d Cir. 1992) (quoting In re Nejberger, 934 F.2d 1300, 1302 (3d Cir. 1991)); see also Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  We must look, therefore, to New Jersey law to determine whether the funds held by The

---

[3]Because we find that the funds held by the Salvation Army are not owing to Modular and thus not part of the bankruptcy estate, we find it unnecessary both to determine whether, under New Jersey law, the funds should be considered held in constructive trust for the benefit of subcontractors and to determine what priority First Indemnity would have were the funds at issue part of the bankruptcy estate and not held in constructive trust for the benefit of subcontractors.

[4]As explained in Part V infra, we will remand to the bankruptcy court for a determination of whether any supplemental facts, not in the present record, would demonstrate that Modular had a legal or equitable interest in any part of the funds held by the Salvation Army.

Salvation Army are properly the "property" of the bankruptcy estate here.

The contract between Modular and the Salvation Army requires Modular to pay its subcontractors before final payment is due to Modular. Moreover, it is undisputed, based upon the record currently available in this case, that Modular has failed to pay some of its subcontractors. The question, then, is whether Modular is owed the funds retained by the Salvation Army. Under New Jersey law, "[a] contract right becomes an account as performance is made under the contract." Continental Fin., Inc. v. Cambridge Lee Metal Co., 241 A.2d 853, 860 (N.J. Super. Ct. Law Div. 1968), aff'd, 252 A.2d 417 (N.J. Super. Ct. App. Div. 1969), aff'd, 265 A.2d 536 (N.J. 1970). Thus, if the contract is not performed, nothing comes into existence upon which a lien could attach. See Damato v. Leone Contr. Co., 25 A.2d 302 (N.J. Super. App. Div. 1956) (holding that a tax lien could not attach to the unpaid balance of a construction contract because of the contractor's failure substantially to perform his contract); see also United States v. Commonwealth of Pa. Dep't of Highways, 349 F. Supp. 1370, 1381-82 (E.D. Pa. 1972) (where contractor's failure to pay subcontractors constituted a breach of its contract, the remaining contract funds were not due to the contractor and thus not part of the bankrupt estate); Atlantic Ref. Co. v. Continental Casualty Co., 183 F. Supp. 478, 482-83 (W.D. Pa. 1960) (holding that "a failure by the contractor here to pay for labor and materials is just as much a failure to

perform and carry out the terms of the contract as an abandonment of the work would have been").

In the present case, Modular did not fulfill its contractual obligation to pay all of its subcontractors. First Indemnity, as surety for Modular, is required to pay any subcontractor not paid by Modular. The funds held by the Salvation Army must be employed to satisfy these claims, either in direct payments to the subcontractors or in reimbursement to First Indemnity for the payments it has made as surety, standing in the Salvation Army's shoes, to the subcontractors. If the Salvation Army were to be required to pay the monies it is holding into the bankruptcy estate, First Indemnity apparently would have to seek recovery for its payments to the subcontractors only as an unsecured creditor, in competition with the other unsecured creditors. This is a result contemplated neither by the contract, as we have explained it, nor by New Jersey law.

New Jersey has recognized in cases of government contracts that payments held by the government, as owner of a construction project, did not become part of the bankrupt's estate. This concept was first enunciated by the United States Supreme Court in Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962). In Pearlman, a priority dispute arose between the trustee of the bankrupt estate and the surety with respect to contract funds retained by the United States, the owner of the construction project at issue. The court held that the monies at issue had not become part of the bankrupt's estate; instead, the

13

retained funds remained the property of the owner, and by way of subrogation,[5] became the surety's property to the extent necessary to reimburse it for its payment to laborers and materialmen.  See id. at 141.  The Court explained:

> Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another.  Property interest in a fund not owned by a bankrupt at the time of adjudication whether complete or partial, legal or equitable, mortgages, liens or simple priority or right are, of course, not a part of the bankrupt's property and do not vest in the trustee.  The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.

Id. at 135-36.  The Court then concluded:

> We therefore hold in accord with the established legal principles stated above that the government had a right to use the retained funds to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the funds; that the contractor had he completed his job and paid his laborers and materialmen would have become entitled to the fund, and that the surety having paid the laborers and materialmen is entitled to the benefit of all these rights to the extent necessary to reimburse it.

---

[5]The subrogation scheme that is part of the Pearlman doctrine has been explained in National Shawmut Bank, see footnote 1, supra. See also Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967), cert. denied, 390 U.S. 906 (1968):

> The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government [owner] and entitled to any rights the government has to the retained funds.  If the contractor fails to complete the job, the government can apply the retained funds and any remaining progress money to costs of completing the job.

Id. at 141;[6] see also Polish v. Johnson Serv. Co., 333 F.2d 545 (3d Cir. 1964) (following Pearlman); Framingham Trust Co. v. Gould-National Batteries, Inc., 427 F.2d 856, 859 (1st. Cir. 1970) (explaining that "we cannot escape the conclusion that in both a practical and a legal sense, the payment of previously unpaid laborers and materialmen is a cost of completing the

---

[6]The adoption of the Bankruptcy Code in 1978 has not undercut Pearlman's vitality.

> In [Pearlman], the Supreme Court found that where by the doctrine of subrogation a surety becomes the virtual owner of property that would otherwise be the property of the debtor, the property will not become an asset of the estate. Although the attempt of the Congress in enacting the Code was to give the broadest possible scope to what are assets of the estate, it is doubtful if that decision has been overruled.

2 Daniel R. Cowans, Cowans Bankruptcy Law and Practice § 12.30 at 587-88 (West 1989); accord J. Michael Franks & Michael E. Evans, A Defense of Established Landmarks:  Claims of Construction Sureties to Contract Funds Under Chapter 11, 25 Tort & Ins. L.J. 28, ___ (1989):

> To the extent that a consensus developed, it became generally accepted that enactment of the Code would not weaken the principles of Pearlman. The Pearlman decision itself characterized the surety's entitlement to benefits of subrogation in terms of a "firmly established rule," which was not to be "casually overruled." Certainly, the Code's definition of a bankruptcy estate differs from the estate that was created by the former Bankruptcy Act and considered in Pearlman. But, following the first wave of decisions under the Code with respect to sureties' rights, and through early 1985, it could be said rather confidently that Pearlman had weathered such assaults as the Code made available against it.

contract"); In re Pacific Marine Dredging and Construction, 79 B.R. 924, 929 (Bankr. D. Or. 1987) (debtor's failure to pay for labor and materials was breach of public construction contract; consequently debtor had no legal or equitable interest in fund retained by owner and fund was not part of bankruptcy estate).

This concept of surety was recognized by the New Jersey Superior Court, Chancery Division in Stevlee Factors, Inc. v. State, 346 A.2d 624 (N.J. Super. Ct. Ch. Div. 1975). There the superior court, chancery division, broadly embraced and followed the subrogation rationale and doctrine enunciated in Pearlman, holding that "[s]ince the sureties stand in the place of those whose claims they have paid, the funds must be paid to the sureties just as the funds would have gone in the absence of a bond -- to the labor and materialmen rather than to the general creditors." 346 A.2d at 627. The court also cited Jacobs v. Northeastern Corp., 206 A.2d 49, 54 (Pa. Super. 1965), which stated, "Payment of the retained balance became due and available only upon the performance by the sureties of Northeastern's obligation. It is clear that all labor and materials claims must be fully discharged before there is entitlement to the full contract payment." Stevlee Factors, 346 A.2d at 627-28.[7]

---

[7]Cf. Transamerica Ins. Co. v. Barnett Bank of Marion County, 540 S.2d 113 (Fla. 1989), where the court held that a surety's equitable subrogation rights had priority over a bank's perfected security interest. The court stated:

> [T]he overwhelming and essentially unanimous
> post U.C.C. decisions in this country,
> federal as well as state courts, have held
> that (1) the surety's equitable right of
> subrogation is not a consensual security

We find that the reasoning in <u>Stevlee Factors</u> represents an incorporation of <u>Pearlman</u> into New Jersey common law. In the absence of contrary authority, we conclude that we must apply the <u>Pearlman</u> doctrine, which convinces us to find, based upon the record currently available in this case, that Modular's failure to pay its subcontractors was a breach of its contract such that it was not owed the funds held by the Salvation Army. As a consequence, those funds did not become a part of the estate in bankruptcy.

Our conclusion is not undercut by this Court's decision in <u>Universal Bonding Ins. Co. v. Gittens & Sprinkle, Entr., Inc.</u>, 960 F.2d 366 (3d Cir. 1992), where we held that "monies <u>owed but not yet paid</u> to Gittens by state, municipal and federal agencies do not constitute statutory or equitable trusts in the hands of the government agencies and therefore may be collected by Gittens." <u>Id.</u> at 367–68 (emphasis added). In contrast to the situation in <u>Gittens</u>, in the present case, because of Modular's failure to pay its subcontractors, Modular was not "owed" the monies held by the Salvation Army. Indeed, the court's rationale in <u>Gittens</u> is completely consistent with our holding here. If the funds had been "owed" to Modular, they would have become "accounts" under New Jersey law, <u>see</u> <u>Continental Finance</u>, 241

_____

> interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre Code law, superior to the claim of a contract assignee.

<u>Id.</u> at 116.

17

A.2d at 860.  Because, however, Modular had not paid all the subcontractors, under the terms of Modular's contract with the Salvation Army the funds were not owed to Modular.  If the subcontractors had been paid and the monies held by the Salvation Army were in fact owed to Modular, the Pearlman doctrine would not then be applicable.

Moreover, we find unpersuasive the bankruptcy and district courts' reasoning that the Pearlman doctrine applies only to public contracts with the government and not to private contracts.  There is no such limitation mentioned or implied by the court in Stevlee Factors.  While Stevlee Factors also involved a public contract, we find that it represents an encompassing approval of Pearlman without limitation only to public contracts.  See 346 A.2d at 626-28.  The basis cited by the New Jersey court for the adoption of the Pearlman doctrine is the equitable doctrine of subrogation which "has received wide application by the courts of this State and is referred to as a right highly favored in law."  Id. at 627 (citing Standard Accident Ins. Co. v. Pellecchia, 104 A.2d 288 (N.J. 1954); A.&B. Auto Stores of Jones St., Inc. v. Newark, 279 A.2d 693 (N.J. 1971)).

Moreover, such a limitation of the equitable doctrine of subrogation only to public contracts would be illogical.  The equitable obligation of the owner to pay subcontractors from contract funds remaining in the owners hands is not confined to government projects, see e.g. Mid-Continent Casualty Co. v. First National Bank & Trust Co., 531 P.2d 1370, 1376 (Okla. 1975)

(surety has priority over secured lender in dispute over remaining contract funds regardless of whether project is private or public).  The Supreme Court in Pearlman based its holding on common law principles of property rights and subrogation, not upon principles or rights arising from statutes governing public contracts.  See Pearlman, 371 U.S. at 139-40.  There is also nothing in the Court's reasoning in Pearlman that implies that its doctrine should apply only to public contracts.  The fact that the issue arose in a Miller Act case would appear to be fortuitous.  As explained by the Court of Appeals for the First Circuit in Framingham Trust Co. v. Gould-National Batteries, Inc., 427 F.2d 856, 857-58 (1st Cir. 1970):

> The government's well established right to
> have the laborers and materialmen paid out of
> the unpaid progress payments or unpaid
> balance does not arise from any legal
> obligation to such suppliers but simply from
> its equitable obligation to those who provide
> it with labor and materials.  We see no
> reason why that same equitable obligation to
> the laborers and materialmen should not exist
> on the part of the non-government owner, who
> receives the same benefit from those
> suppliers -- construction work and materials
> -- as did the government in the
> aforementioned cases.  Moreover, the non-
> government owner, like the government, has an
> interest in seeing its suppliers paid so that
> the work necessary for completion of the
> contract can be done with minimum disruption
> and expense.

(citations and footnotes omitted).

We conclude that, based upon the record currently available in the present case, Modular breached its contractual obligation to pay its subcontractors and was therefore not "owed"

19

the monies held by the Salvation Army. Under those circumstances, those funds are not properly considered part of the estate in bankruptcy and are not subject to the Bank's superpriority lien. We will therefore reverse the bankruptcy court's turnover order.

V.

With that said, we are uncomfortable with the development of the record in the present case. Because of the bankruptcy court's conclusion that the funds held by the Salvation Army were part of the estate in bankruptcy, it did not find it necessary to hold a hearing to determine if any other factors might establish that any part of the funds were "owed" to Modular. For example, the extent to which Modular failed to pay its subcontractors has never been documented adequately. Nor did the bankruptcy court undertake to explore whether Modular had any other basis upon which to claim the funds being held by the Salvation Army. We conclude that further proceedings may be necessary to determine if Modular has grounds to claim any of these funds. We will, therefore, remand this case to the bankruptcy court to conduct such further proceedings it deems appropriate in light of the above.

## VI.

For the foregoing reasons, we will reverse the order of the district court and will remand this case to the district court with directions to remand it to the bankruptcy court for further proceedings consistent with this opinion.