**In re C & C EXCAVATING, INC., Debtor.**

**Halstead Contractors, Inc., Plaintiff,**

**v.**

**C & C Excavating, Inc., Colonial Bank, Inc., Southeast Materials Corporation, Asphalt Paving Company, Inc., Sherman International Corp., Gary Ingram Grading & Paving, Inc., the United States of America, the State of Alabama, and Action Utility Contractors, Inc., Defendants.**

**Bankruptcy No. 00–43424.**
**Adversary No. 01–40210.**

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

July 17, 2002.

Harry Long, Anniston, AL, for Debtor.

James G. Henderson, Birmingham, AL, trustee.

### MEMORANDUM OF OPINION AND ORDER

JAMES S. SLEDGE, Bankruptcy Judge.

Plaintiff Halstead Contractors, Inc.("Halstead") is a general contractor that entered into various subcontracts with C & C Excavating, Inc. (the "Debtor"). The Debtor agreed to be a subcontractor for Halstead in the construction of projects in Tuskegee, Greenville, and Montgomery, Alabama. The Debtor failed to pay its subcontractors (the "Sub-subcontractors"), and the Debtor filed for bankruptcy protection under chapter 11 of the United States Bankruptcy Code on November 16, 2000. At that time, Halstead was holding a total of $180,740.74 (the "Contract Balance" or the "Funds"). Halstead brings this action against the named defendants

seeking a ruling that the Contract Balance is not property of the Debtor's bankruptcy estate and that therefore it may pay the Contract Balance to the Sub-subcontractors. This action is presently before the Court on various motions for summary judgment. Appearances were noted on the record. Halstead filed a motion for summary judgment ("Halstead's Motion"). Colonial Bank, Inc. ("Colonial") and the United States of America (the "IRS") are the only parties that filed a response to Halstead's Motion. Colonial, which claims a first priority perfected security interest in the Debtor's accounts receivable, also filed a Motion for Summary Judgment ("Colonial's Motion") in which it claims that the Contract Balance is property of the Debtor's bankruptcy estate and therefore Halstead should be required to pay the Contract Balance into the bankruptcy estate. Further, Gary Ingram Grading & Paving, Inc. ("Ingram") filed a Motion for Summary Judgment ("Ingram's Motion") in which it claims that it has a perfected mechanic's lien in the unpaid contract balance owing at the time it sent its notice of intent to file lien to the owner of the Tuskegee Project (as defined below). Halstead filed a response and objection to Colonial's Motion and Ingram's Motion. The aforementioned motions are collectively referred to as the "Motions." Although the IRS filed a motion for summary judgment, counsel for the IRS informed the Court in oral argument that this motion is to be treated as a response to Halstead's Motion.

The Court, having reviewed the Motions, and their exhibits, the Affidavit of Foy Tatum, the Memoranda Submitted by the Parties, and all the files, records, and proceedings in this matter, and having heard the arguments of counsel, and based on the undisputed facts contained in the record, finds that Halstead's Motion is due to be granted as specified herein. Ingram's

Motion is moot because the Court has found that the Contract Balance is not property of the bankruptcy estate and Halstead is authorized to distribute the Funds to Ingram and the other Sub-subcontractors. The Court further finds that Colonial's Motion is due to be denied because the Contract Balance is not property of the estate and therefore Colonial's liens do not attach to the Contract Balance.

The Court has concluded that the following are:

### UNDISPUTED FACTS

1. Halstead is a general contractor engaged in general construction of buildings for companies including CVS Pharmacy ("CVS") and Kentucky Fried Chicken ("KFC").

### A. The Tuskegee Project.

2. On or about June 5, 2000, Halstead, as general contractor, entered into a subcontract (the "Tuskegee Contract") with Debtor under which Debtor agreed to be a subcontractor in the construction of a CVS store in Tuskegee, Alabama (the "Tuskegee Project").

3. Subsequently, to perform its obligations under the Tuskegee Contract, the Debtor subcontracted with various material suppliers and other Sub-subcontractors, including Ingram, Sherman International Corp. ("Sherman"), and Action Utility Contractors, Inc. ("Action").

4. Ingram has claimed that it is owed approximately $65,160.91 for work and materials that Ingram allegedly provided to the Tuskegee Project. Sherman has claimed that it is owed approximately $2,059.13 for work and materials that Sherman allegedly provided to the Tuskegee Project. Action has claimed that it is owed approximately $5,195.33 for work and materials that Action allegedly provid-

ed to the Tuskegee Project. It is undisputed that neither Sherman nor Action took any steps to perfect liens on the Tuskegee Project. Indeed, neither Sherman nor Action claim a lien on the Tuskegee Project.

5. Ingram claims two liens on the Tuskegee Project, one to secure an indebtedness in the amount of $7,601.41 and another to secure an indebtedness in the amount of $57,559.50. The indebtedness in the amount of $7,601.41 is alleged to have matured on September 13, 2000. The indebtedness in the amount of $57,559.50 is alleged to have matured on September 13, 2000. On March 12, 2001, Ingram filed suit to enforce its lien in the Circuit Court of Macon County, Alabama. The last date upon which Ingram furnished materials or labor for the Tuskegee Project is alleged to be September 13, 2000. It appears that on January 12, 2001, Ingram filed Statements of Lien for both of its alleged liens. Further, it appears that on or about December 23, 2000, Ingram provided written notice of its lien. On that same date, the unpaid contract balance owing to Halstead from the owner was $53,200.08.

6. The current balance (not accounting for payments owed to the sub-subcontractors) owing under the Tuskegee Contract is approximately $27,604.00 (the "Tuskegee Contract Balance").

7. Neither the IRS nor the Alabama Department of Revenue ("ADR") filed liens in Macon County, Alabama.

## B. The Greenville Project.

8. On or about June 30, 2000, Halstead, as general contractor, entered into a subcontract (the "Greenville Contract") with Debtor under which Debtor agreed to be a subcontractor in the construction of a CVS store located in Greenville, Alabama (the "Greenville Project").

9. Subsequently, to perform its obligations under the Greenville Contract, the Debtor subcontracted with various material suppliers and other Sub-subcontractors, including Sherman, Asphalt Paving Company, Inc. ("Asphalt"), and Action.

10. Sherman has claimed that it is owed approximately $6,673.10 for work and materials that Sherman allegedly provided to the Greenville Project. Asphalt has claimed that it is owed approximately $76,075.00 for work performed or materials provided to the Greenville Project. Action has claimed that it is owed approximately $9,955.45 for work and materials that Action allegedly provided to the Greenville Project. Only Asphalt and Sherman have taken certain steps towards perfecting their liens upon the Greenville Project pursuant to Alabama law. The entire debt owing to Sherman on the Greenville Project is alleged to have matured on September 14, 2000. Sherman allegedly filed suit to enforce its lien in the Circuit Court of Butler County, Alabama. It is unclear when Sherman furnished the last item of its material for the Greenville Project. It appears that on December 15, 2000, Sherman filed a Verified Statement of Lien with the Probate Court for Butler County. It further appears that on or about December 13, 2000, Sherman provided a Notice of Intent to File Materialman's Lien to Oahu Properties, LLC, the apparent owner of the Greenville Project. On that same date, the unpaid contract balance owing to Halstead by the project owner was $203,240.00.

11. Additionally, the entire indebtedness owing to Asphalt allegedly matured on December 7, 2000. It appears that on or about March 6, 2001, Asphalt filed suit to enforce its lien in the Circuit Court of Butler County, Alabama. The last date upon which Asphalt furnished materials to the Greenville Project was allegedly De-

cember 15, 2000. On January 8, 2001, it appears that Asphalt filed a Statement of Lien in the Probate Court for Butler County, Alabama. On or about December 28 or 29, 2000, Asphalt allegedly provided written notice of its lien to CVS Pharmacy. On that same date, the unpaid contract balance owing to Halstead was $44,626.37.

12. The current balance (not accounting for payments owed to the Sub-subcontractors) owing under the Greenville Contract is approximately $88,806.74 (the "Greenville Contract Balance").

13. Neither the IRS nor the ADR filed liens in Butler County, Alabama.

## C. The Montgomery Project.

14. On or about August 11, 2000, Halstead, as general contractor, entered into a subcontract (the "Montgomery Contract") with Debtor under which Debtor agreed to be a subcontractor in the construction of a KFC restaurant located on Atlanta Highway in Montgomery, Alabama (the "Montgomery Project").

15. Subsequently, to perform its obligations under Montgomery Contract, the Debtor subcontracted with various materials providers and other Sub-subcontractors including Sherman, Southeast Materials Corporation ("Southeast"), Asphalt, and Action.

16. Sherman has claimed that it is owed approximately $7,354.81 for work it allegedly performed and materials it allegedly provided for the Montgomery Project. Southeast has claimed that it is owed approximately $677.33 for work it allegedly performed and materials it allegedly provided to the Montgomery Project. Asphalt has claimed that it is owed the sum of $60,300.00 for work it allegedly performed and materials it allegedly provided to the Montgomery Project. Action has claimed that it is owed approximately

$2,000.00 for work it allegedly performed and materials it allegedly provided to the Montgomery Project. It is undisputed that Action does not claim a lien on the Montgomery Project. The entire debt owing to Sherman for work performed on the Montgomery Project is alleged to have matured on November 5, 2000. Sherman allegedly filed suit to enforce its lien in the Circuit Court of Montgomery County on May 7, 2001. On or about October 6, 2000, Sherman allegedly furnished its last item of material for the Montgomery Project. It appears that on or about January 17, 2001, Sherman filed its Verified Statement of Lien with the probate judge for the Circuit Court of Montgomery County, Alabama. Moreover, on or about January 10, 2001, Sherman provided a written Notice of Intent to File Materialman's Lien to KFC of America, Inc. On that same date, the unpaid contract balance owing to Halstead by the project owner was $51,846.00.

17. Additionally, Asphalt alleges that the entire indebtedness owing to Asphalt matured on November 9, 2000. It appears that Asphalt filed a lawsuit in the Circuit Court of Montgomery County, Alabama on March 5, 2001. The last date upon which Asphalt delivered materials to the Montgomery Project was allegedly November 17, 2000. Further, it appears that Asphalt filed a Statement of Lien on January 5, 2001 with the probate judge for Montgomery County, Alabama. On or about December 28, 2000, Asphalt allegedly provided notice of its intent to file lien. On that same date, Halstead was owed the unpaid contract balance in the amount of $51,846.00.

18. The current balance owing under the Montgomery Contract (not accounting for amounts owed to sub-subcontractors) is approximately $64,330.00 (the "Montgomery Contract Balance").

19. Neither the IRS nor ADR filed liens in Montgomery County, Alabama.

### D. General for All Projects.

20. Pursuant to the terms of Article XIV of each contract, "should sub-contractor (Debtor) at any time fail to pay for all labor, materials or supplies used by subcontractor in said work when due, Contractor (Halstead) may, at his option, pay for same and charge to sub-contractor."

21. Pursuant to the terms of the general construction contract between Halstead and the owner of each of the Projects, Halstead may be obligated to indemnify the owners of each Project for any and all amounts owing for any lien claims filed by any vendors, subcontractors or sub-subcontractors of each Project.

22. Moreover, Article X(a) of each contract states as follows: "Sub-contractor shall turn said work over to Contractor (Halstead) in good condition and free and clear of all claims, encumbrances, or liens and shall protect and save harmless Contractor and Owner from all claims, encumbrances and liens growing out of the performance of this sub-contract and Subcontractor will at his own cost and expense (including attorney's fees), defend all suits to establish such claims, and pay any such claim or lien so established."

23. The Contract Balance (not accounting for payments owed to the Sub-subcontractors) is approximately $180,740.74.

24. The Debtor has failed to pay the Sub-subcontractors as agreed to in the Contracts.

25. On November 16, 2000, the Debtor filed for bankruptcy protection under chapter 11 of the United States Bankruptcy Code.

26. On October 2, 2001, the bankruptcy case was converted to a case under chapter 7 of the United States Bankruptcy Code.

### E. Colonial's Claim.

27. Colonial filed a UCC–1 Financing Statement on or about August 12, 1996 with the Alabama Secretary of State in which it described its collateral as including "accounts ..." Colonial claims it is owed approximately $110,000.00 and claims a first priority lien on, *inter alia*, all accounts and contract rights of the Debtor, including proceeds thereof.

### F. Taxing Authorities' Claims.

28. The IRS did not file in the counties where the Projects were located (that is, the counties where the lien claimants could have searched the probate records before choosing to perform work for the Debtor). Indeed, the IRS states in its Motion for Summary Judgment that it only filed Notices of Federal Tax Liens in St. Clair County (Ashville), St. Clair County (Pell City), and with the Alabama Secretary of State on September 5, 2000, September 6, 2000, and September 13, 2000, respectively.

29. The Alabama Department of Revenue ("ADR") did not file in counties where the Projects are located (that is, the counties where the lien claimants could have searched the probate records before choosing to perform work for the Debtor). Indeed, when asked to explain in discovery why it has a superior right to the Funds, the ADR did not state that it had filed in the counties where the Projects are located. The IRS and the ADR are sometimes collectively referred to herein as the "Taxing Authorities."

The Court has concluded that the action should be resolved by application of the following:

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

## THE SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a party seeking to recover on a claim may move for summary judgment in the party's favor upon all or any part thereof. As clarified by the ruling of the United State Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986), a party moving for summary judgment is not required to present evidence negating the opposing party's claims. Such a duty does not arise until such time as the opposing party produces substantial evidence demonstrating a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Genuine" means enough evidence that a reasonable jury could return a verdict for the non-moving party under the substantive evidentiary standard applicable to the case. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. Even if a party presents some evidence in its favor, summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Id.* at 249–50, 106 S.Ct. 2505. The non-moving party cannot rest on speculation, suspicion or the mere hope that something will turn up at trial. *See, e.g., Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988).

## LEGAL CONCLUSIONS

Halstead is entitled to pay the Funds to the parties who earned it—that is, the Sub-subcontractors and vendors—because the Funds are not property of the bankruptcy estate. 11 U.S.C. § 541 defines "property of the estate" and states in pertinent part:

a. The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1).

Although the definition of "property of the estate" is indeed broad, it is not unlimited in scope. For example, it is axiomatic that a bankruptcy estate acquires no greater ownership rights over property than the Debtor would have acquired prior to the bankruptcy filing. *See Universal Bonding Insurance Co. v. Gittens and Sprinkle Enterprises,* 960 F.2d 366, 372 (3rd Cir., 1992); 4 Colliers On Bankruptcy § 541.13 at 541–66 (15th ed.1983) ("the rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed . . . ."); *Pearlman v. Reliance Insurance Company,* 371 U.S. 132, 135, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) ("Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee.").

It is a general rule that "[a]lthough section 541 defines property of the estate, we must look to state law to determine if a property right exists and to stake out its dimensions." *In re Nejberger,* 934 F.2d

1300, 1302 (3d Cir.1991); *In re Livingston,* 804 F.2d 1219, 1221 (11th Cir.1986).

■ In Alabama, "[c]ourts should not enforce an agreement where the party seeking enforcement has failed to perform his part of the agreement." *Gray v. Reynolds,* 553 So.2d 79, 82 (Ala.1989); *see also Smith v. Clark,* 341 So.2d 720, 721 (Ala. 1977) ("this court should not enforce an agreement where the party seeking to enforce the agreement has failed to perform his part of the bargain."). Thus, in Alabama, one who fails to perform the requirements of a contract is not entitled to the benefits of said contract. *See id.*

The case styled *Fidelity and Casualty Company of New York v. Central Bank of Birmingham,* 409 So.2d 788 (Ala.1982) is on point and is dispositive. In *Fidelity and Casualty Company,* the subcontractor was owed $30,000 under the terms of its contract with the general contractor. Central Bank had a perfected security interest covering all of the subcontractor's inventory, accounts receivable, and contract rights, including proceeds thereof. Additionally, the surety had been required to pay $38,000.00 as a result of the subcontractor's failure to pay its material suppliers. Moreover, the contract between the general contractor and the subcontractor required the subcontractor to pay all of its laborers and material suppliers and further provided that the contractor could withhold payment to the subcontractor until it received proof that the subcontractor had paid all of its materialmen. The crux of the dispute was whether Central Bank or the surety had priority as to the $30,000 which the general contractor owed to the subcontractor. Focusing upon the contract language and the surety's rights to be subrogated to the rights of the unpaid materialmen, the Alabama Supreme Court held as follows:

> [T]he contract funds which were in the hands of [the general contractor] did not belong to [the subcontractor] once it had failed to pay the material supplier. [The surety], through its obligation to pay under the bond, is entitled to the funds, and not [the subcontractor] or Central Bank, claiming through [the subcontractor]. It makes no difference in this situation when the Bank's assignment was perfected because there is nothing owing to [the subcontractor] to pass by virtue of the assignment.

*Id.* at 790–91.

Similarly, it is undisputed that the Debtor failed to pay the Sub-subcontractors as required under the terms of the Contracts. Hence, under Alabama law, the Debtor has no legal or equitable rights in the Contract Balance.

■ Furthermore, under Alabama law, as a result of the Debtor's breach of the Contracts, the Funds do not represent an "account receivable" or "contract right" of the Debtor and therefore neither Colonial Bank, the IRS, nor the ADR has a claim to the Funds based on their arguments that their liens attach to accounts receivable or contract rights of the Debtor. Alabama Code Section 7–9–106 describes an account receivable as follows: "'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." *Ala.Code* § 7–9–106. As evidenced above, the Debtor has breached each of the Contracts by failing to remit payment to the Sub-subcontractors. Accordingly, Halstead has the express contractual right to pay the Sub-subcontractors directly and charge said payments back to the Debtor. Thus, the Debtor has no "right to payment" and the Funds do not constitute accounts receiv-

able or contract rights of the Debtor under Alabama law.

■ Having determined that under Alabama law a subcontractor has no rights to withheld contract funds if it fails to pay its Sub-subcontractors or suppliers, it is apparent that such withheld contract funds are not property of the subcontractor's bankruptcy estate under Section 541 of the Bankruptcy Code. The analysis of this issue begins with the Supreme Court case of *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The dispute in *Pearlman* was between the bankruptcy trustee of a government contractor and the contractor's payment bond surety over which had the superior rights to funds withheld by the government out of earnings due the contractor. At the time the contractor filed bankruptcy, the government was holding $87,735.35 which would have been paid to the contractor had it paid its subcontractors. Because the subcontractors were not paid, the surety was required to pay in excess of $300,000 to satisfy their claims. Relying upon its right of subrogation arising from its payment of the general contractor's suppliers, the surety made a claim to the withheld funds. In response, the bankruptcy trustee argued that the funds were property of the estate to which the estate had a superior interest. The court began its analysis by noting that if "the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt." *Id.* at 136, 83 S.Ct. 232. Relying upon its previous decisions in *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412

(1896) and *Henningsen v. United States Fidelity & Guar. Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), the Supreme Court held as follows:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Id.* at 141–42, 83 S.Ct. 232.

Additionally, the case of *In re Modular Structures, Inc.*, 27 F.3d 72 (3d Cir.1994) is on point and particularly persuasive. Prior to filing for bankruptcy, Modular had contracted to serve as general contractor for the development of a new corporate headquarters for the Salvation Army. Subsequent to the bankruptcy filing, the bank, as secured creditor of the debtor, filed a notice of motion for turnover to obtain the contract proceeds held by the Salvation Army. The bonding company filed a cross motion to place those contract proceeds in escrow to assure that there were funds available to pay the subcontractors. The bank had loaned to the debtor $1.5 million and had taken a perfected security interest in all of the debtor's accounts receivable, contracts and proceeds thereof. Following the debtor's bankruptcy filing, the bank pursued collection of the debtor's accounts receivable. The bonding company argued that the unpaid contract proceeds held by the Salvation Army were not properly characterized as accounts receivable owing to the debtor and therefore the bank's lien would not apply to them. In support of its

argument, the bonding company pointed to the terms of the contract between the debtor and Salvation Army wherein the debtor agreed that it would not be paid until it had paid its subcontractors. In reversing both the bankruptcy court and the district court which had ruled that the withheld funds were property of the bankruptcy estate, the Third Circuit instructed as follows:

> The contract between Modular and the Salvation Army requires Modular to pay its subcontractors before final payment is due to Modular. Moreover, it is undisputed, based upon the record currently available in this case, that Modular has failed to pay some of its subcontractors. The question, then, is whether Modular is owed the funds retained by the Salvation Army. Under New Jersey law, "[a] contract right becomes an account as performance is made under the contract." (Citations omitted). Thus, if the contract is not performed, nothing comes into existence upon which a lien could attach.

*Id.* at 77.

The court in *In re Modular Structures, Inc.* further relied upon the Supreme Court's ruling in *Pearlman* and instructed that the *Pearlman* decision was not limited solely to situations where there was a government contract involved. As the court instructed, "[t]he equitable obligation of the owner to pay subcontractors from contract funds remaining in the owner's hands is not confined to government projects." *Id.* at 79 (citing *Mid–Continent Casualty Company v. First National Bank and Trust Company of Chickasha*, 531 P.2d 1370, 1376 (Okla.1975) (surety has priority over secured lender in dispute over remaining contract funds regardless of whether contract is private or public)). Thus, the withheld contract funds were not property of the debtor's bankruptcy estate

because of the debtor's breach of its contract with the Salvation Army. As a result of this breach, the debtor was not owed these monies and therefore the monies were not part of its bankruptcy estate to which the bank's lien could attach. *Id.* at 80. *See also Damato v. Leone Constr., Co.*, 41 N.J.Super. 366, 125 A.2d 302 (App. Div.1956) (holding that a tax lien could not attach to the unpaid balance of a construction contract because of the contractor's failure substantially to perform his contract); *United States v. Commonwealth of Pennsylvania Department of Highways*, 349 F.Supp. 1370, 1381–82 (E.D.Pa.1972) (where contractor's failure to pay subcontractors constituted a breach of its contract, the remaining contract funds were not due to the contractor and thus not part of the bankrupt's estate); *Atlantic Ref. Co. v. Continental Casualty Company*, 183 F.Supp. 478, 482–83 (W.D.Pa.1960) (holding that "a failure by the contractor here to pay for labor and materials is just as much a failure to perform and carry out the terms of the contract as an abandonment of the work would have been."; consequently, the contractor "could 'not get' the withheld balances.").

Additionally, *In re Pacific Marine Dredging and Construction*, 79 B.R. 924 (Bankr.D.Or.1987) is instructive. In early 1984, Key Bank provided a line of credit for the debtor and took back a perfected security interest in all of the debtor's accounts and general intangibles. Subsequently, the debtor entered into a contract with plaintiff under which debtor would serve as general contractor on a project. The contract required that the debtor promptly pay its subcontractors for their work and further provided that the debtor was not entitled to final payment until it provided proof that it had paid all of its subcontractors. When it received notice that the debtor had failed to pay its subcontractors, the plaintiff withheld payment

to the debtor. The plaintiff ultimately interpled the unpaid contract balance which was claimed by both the debtor and the surety which had paid the subcontractors. The surety argued that the unpaid contract balance was not property of the debtor's bankruptcy estate and therefore neither Key Bank nor the debtor had any interest in the funds. In agreeing with the debtor, the court instructed as follows:

> Generally, 11 U.S.C. § 541 provides that all legal or equitable interests of the debtor in property as of the commencement of the case becomes property of the estate. Here, debtor breached the contract by not paying its subcontractors. Plaintiff exercised its statutory and contractual rights and withheld the final payment.
>
> This court agrees with other courts that have found that the contractor's failure to pay for labor and materials is just as much a failure to perform and carry out the terms of the contract as an abandonment of the work. In short, the plaintiff is not contractually obligated to pay the fund to debtor. Due to debtor's breach of contract, the debtor does not have any legal or equitable interest in the fund. Accordingly, the fund is not property of the estate.

*Id.* at 929 (citing *United States v. Commonwealth of Pennsylvania Department of Highways*, 349 F.Supp. 1370, 1381–92 (E.D.Pa.1972); *Atlantic Ref. Co. v. Continental Casualty Company*, 183 F.Supp. 478, 482–83 (W.D.Pa.1960)).

Further, *Donald Hoagland v. Edward Hines Lumber Company (In re LWMcK Corporation d/b/a National Building Systems)*, 196 B.R. 421 (Bankr.S.D.Ill.1996) ("*Hoagland*") supports these results. In *Hoagland*, Cambridge, the owner of a construction project, entered into a construction contract with LWMcK which then entered into a subcontract with Greenwell.

Greenwell subsequently purchased materials from the defendant sub-subcontractor. After Greenwell failed to pay for said materials, the defendant sub-subcontractor filed a notice of mechanic's lien pursuant to Illinois law. LWMcK subsequently filed a petition in bankruptcy. Subsequently, Cambridge paid the amounts owing to the defendant and the defendant executed a lien waiver.

The bankruptcy trustee, pursuant to Section 549 of the Bankruptcy Code, sought to recover for the bankruptcy estate the payment that Cambridge made to the defendant sub-subcontractor to satisfy the defendant's lien claim. The court held that the payment made by Cambridge could not be recovered for the bankruptcy estate because the money was not property of the Debtor's bankruptcy estate. In making this decision, the court noted the general rule that "payments made by a contract debtor of the bankrupt to a creditor of the bankrupt do not become part of the bankruptcy estate where there is an independent obligation on the part of the contract debtor to pay the creditor." *Id.* at 423.

In determining whether Cambridge had such an independent obligation, the court pointed to the language of the contract between Cambridge and LWMcK. Under the contract, Cambridge had the right to withhold any monies otherwise owing to the Debtor to pay any sub-subcontractors that the Debtor failed to pay. According to the court: "While the language in [the contract] may not create an independent obligation between Cambridge and Defendant [sub-subcontractor], its legal effect on the bankruptcy estate is the same—to exclude from the bankruptcy estate property which, but for the contractual terms, would otherwise be estate property under 11 U.S.C. § 541." *Id.* at 424. Thus, the money paid by Cambridge to the sub-subcon-

tractor was not property of the Debtor's bankruptcy estate and was therefore not recoverable by the trustee.

In the case at bar, the Contracts are very similar to those at issue in the above referenced cases. In particular, the Contracts contain the following language in Article XIV: "(c) Should Sub-contractor at any time fail to pay for all labor, materials, or supplies used by Sub-contractor in said work when due, Contractor may, at its option, pay for same and charge to Sub-contractor." Further, there is language in the contract with the owner of each of the Projects that imposes a duty upon Halstead to indemnify the owners for any lien claims filed by subcontractors or sub-sub-contractors. Moreover, Article X(a) of each contract states as follows: "Sub-contractor shall turn said work over to Contractor (Halstead) in good condition and free and clear of all claims, encumbrances, or liens and shall protect and save harmless Contractor and Owner from all claims, encumbrances and liens growing out of the performance of this sub-contract and Sub-contractor will at his own cost and expense (including attorney's fees), defend all suits to establish such claims, and pay any such claim or lien so established."

It is beyond dispute that the Debtor has breached the terms of the Contracts in its failure and refusal to pay the Sub-subcontractors. Thus, pursuant to the terms of the Contracts, Halstead has the right to withhold the Funds and pay them directly to the Sub-subcontractors. Further, Halstead has an independent obligation to pay the Sub-subcontractors pursuant to the general contract with the owners on each of the Projects. Accordingly, the Funds are not property of the Debtor's bankruptcy estate. Because the Funds are not property of the estate, neither the Taxing Authorities' liens not Colonial's lien attach to the Funds. *See, e.g., In re HLW Enter-*

*prises of Texas, Inc.,* 157 B.R. 592, 598 (Bankr.W.D.Tex.1993) ("As HLW had no rights to the Interpleaded Funds, the IRS levy was ineffective and did not attach to the fund.").

Colonial's attempts to distinguish the above referenced cases on the basis that they involve sureties is without merit. As evidenced by the foregoing cases, the fact that there were sureties making demand upon the funds is not the reason why the courts found that the contract balances were not property of the bankruptcy estate. Rather, the courts in those cases found that the withheld contract funds were not property of the bankruptcy estate because the debtors had breached the contracts at issue and therefore had no interest in the withheld funds. Further, the *Hoagland* case did not involve sureties, and the subcontract at issue there was nearly identical to the Contracts in the case at bar. *See Hoagland,* 196 B.R. at 424. Just as in the *Hoagland* case, the effect of the language in the Contracts authorizing Halstead to pay the Sub-sub-contractors directly if the Debtor fails to do so, is to remove the Contract Balance from the Debtor's bankruptcy estate.

Additionally, Colonial has argued that Halstead attempts to thwart the distribution scheme under the Bankruptcy Code. Again, this argument is misplaced because the distribution scheme enacted under the Bankruptcy Code only applies to property of the bankruptcy estate. Because the Funds are not property of the bankruptcy estate, they are not subject to the distribution scheme enacted under the Bankruptcy Code. Further, Colonial's arguments that it has a secured claim in the Funds superior to Halstead's claim is without merit because Colonial's security interest does not attach to the Funds, which are not property of the Debtor's bankruptcy estate. Moreover, Colonial's arguments that

the Contract Balance is an account receivable of the Debtor is without merit because, as explained above, the Debtor, as a result of its breach of the Contracts, has no interest in the Funds and therefore no right to payment, as required for an account receivable to exist under Alabama law. *See Ala.Code* § 7–9–106. Accordingly, Colonial's Motion is due to be denied. The Court does not find it necessary to reach the merits of Colonial's arguments concerning perfection of liens because Halstead is allowed to pay the Sub-subcontractors directly regardless of whether they are perfected.[1]

The Court further finds that Ingram's Motion is moot because the Court has found that Halstead's Motion is due to be granted and Halstead is authorized to pay the Sub-subcontractors (including Ingram) directly regardless of whether they have perfected liens.

Although the IRS filed a motion for summary judgment, based upon the representations of counsel for the IRS, this motion is to be treated as a response to Halstead's Motion. The IRS' response is also without merit. The IRS relies primarily upon the case styled *Superpumper, Inc. v. Nerland Oil, Inc., et al. (In re Nerland Oil, Inc.)*, 2001 WL 1203386 (D.N.D.2001) for the proposition that the Contract Balance must be paid into the bankruptcy estate. However, this case is inapposite because in *Nerland Oil*, there is no question that the proceeds of the loan claimed by the IRS under its lien were actually due and owing to the debtor. Unlike in the case at bar, there was no accusation in the *Nerland Oil* case that the debtor had breached the terms of the promissory note, the proceeds of which the

IRS claimed through its tax lien. Thus, unlike in the case at bar, the IRS' lien attached to the loan proceeds owing to the debtor in *Nerland Oil. See id.* at *2.

Halstead, relying on *United States Fidelity and Guaranty Company v. Sidwell*, 525 F.2d 472, 475 (10th Cir.1975), seeks a determination that it is entitled to its reasonable attorneys' fees prior to distributing the contract balance. However, this case was not filed as an interpleader, per Fed. R. Bankr.P. 7022, and that case is inapposite. The request for attorneys' fees is **DENIED.**

Accordingly, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to the instant adversary proceeding through Rule 7056 of the Federal Rules of Bankruptcy Procedure, it is hereby ordered that:

A. Halstead's Motion is **GRANTED** as follows: The Contract Balance is not property of the Debtor's bankruptcy estate, and Halstead is hereby authorized to distribute the Contract Balance pursuant to the applicable contracts. No attorneys' fees are to be deducted. Any excess remaining after distribution is determined to be property of the Debtor's bankruptcy estate and is due to be paid into that estate.

B. Ingram's Motion for Summary Judgment is **DENIED;**

C. Colonial's Motion for Summary Judgment is **DENIED;**

D. All motions and objections not expressly granted are **DENIED.**

---

1. The Parties have also raised the issue of whether the Sub-subcontractors have properly perfected their liens. The Court does not find it necessary to resolve this issue because Halstead is authorized to pay the Sub-subcontractors regardless of whether the Sub-subcontractors have perfected liens.