STATE OF CONNECTICUT *v.* MAX FENSTER

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 10-2383

Argued April 13—decided June 4, 1962[1]

*C. Robert Satti,* of New London, for the appellant (defendant).

*Harold B. Dean,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J. The defendant, convicted in a trial to the court upon an information charging him in the first count with the crime of lascivious carriage or behavior in violation of § 53-219 of the General Statutes and in the second count with making a false report to a police officer; § 53-168; has appealed upon the ground that upon all of the evidence he could not have been found guilty of the charges. The finding, as corrected, discloses that on Sunday night, September 17, 1961, at about 8 o'clock, the defendant met up with a young sailor at the Dolphin

---

[1] For order by the Supreme Court of Errors granting certification of this case for appeal, see 150 Conn. 705, and for order disposing of the appeal under § 696 of the 1963 Practice Book, see 151 Conn. 729.

Restaurant in New London. They were total strangers. The sailor took a seat on a stool at the bar which happened by mere coincidence to be next to that which was occupied by the defendant. They struck up a chance conversation which lasted for nearly an hour, talking of things in general. Just before closing time, which was 9 p.m., the defendant invited the sailor to take a ride with him and have a drink together. The sailor consented. The defendant drove to a deserted area off Ocean Avenue some three miles from the intersection of Bank and Golden Streets and onto an extension of Mansfield Road, where he parked his car and turned out the lights. Thereafter, the defendant exposed himself and made a repeated unwelcome invitation to homosexual activity, whereupon the sailor struck the defendant a severe blow in the right temple, causing him serious injury and laceration by severe bleeding. The sailor then forced the defendant out of the car and drove away, leaving the defendant in the deserted area where the automobile had been parked. The defendant returned to town in a bleeding condition. At about 10:20 p.m., he entered the Lawrence and Memorial Associated Hospitals in New London for treatment of the injury. In accordance with customary hospital practice in a situation of this kind, the night nurse notified the police department of the character of the defendant's injury and shortly afterwards, in response to the call, Officer Richard Brown, in uniform and in the discharge of his official duties, arrived at the hospital to question the defendant, who, at the time, was lying on a treatment table, bleeding, while his forehead was being stitched by a doctor. The defendant told the police officer that at about 9:20 p.m. on the same night, at the corner of Bank and Golden Streets, in New London, he had been struck and knocked down by a sailor dressed in "blues." The trial court found

that this information was false. No such offense as described by the defendant had been committed. Acting upon the information as given by the defendant, the police launched an investigation. The police officer did not advise the defendant that an investigation would be undertaken as a result of his statement.

The defendant's basic claim of error directed against the first count is that the crime of lascivious carriage or behavior under our statute and as interpreted by our courts is applicable only to behavior of persons of different sexes, that is to say, behavior which is heterosexual in character. The defendant places much reliance upon *Fowler* v. *State,* 5 Day 81, decided in 1811, which construed the statute as it had existed since 1784. "Sound [statutory] construction requires that statutes be considered in the light of their history, their language, the purpose they are designed to serve and the circumstances surrounding their enactment." *Cassidy* v. *Tait,* 140 Conn. 156, 160; *Lee* v. *Lee,* 145 Conn. 355, 358. Our lascivious carriage statute is a descendant of a seventeenth-century statute. In 1642, lascivious carriage was made a crime by the "General Courte," which was then the legislative body of the colony of Connecticut. The statute appears in the Code of 1650 as an addendum to the last of a list of fourteen "Capitall Lawes" and reads: "And whereas frequent experience, gives in sad evidence of severall other wayes of uncleanes, and lascivious carriages, practised amongst us; whereunto in regarde of the variety of circumstances, perticular and express lawes and orders cannott suddenly be suted; this Courte cannott but looke upon evills in that kinde, as very pernitious and destructive to the wellfare of this Commonwealth: And, doe judge, that severe and sharpe punnishment, should bee inflicted uppon such delinquents; . . . that others may heare and

feare." Conn. Code of 1650, p. 30 (Andrus & Judd 1833). We are told that "[t]his law originated from the peculiar sentiments of the first settlers respecting the intercourse of the sexes, and was occasioned by a prosecution for this offence before the particular court." Statutes, 1821, p. 164 n. The prosecution referred to was the case heard at a session of the Particular Court on June 4, 1640, when Nicholas Olmsteed was convicted for "laciuious caridge & fowle mysdemenors at sundry tymes w^th Mary Brunson." 1 Col. Rec. 50 (1636-1665). There are also records of prestatutory convictions of "sinfull dalliance" with girls of poor reputation which probably would have constituted lascivious carriage in 1642. See New Haven Blue Laws (Aug. 5, 1640) (Conn. Code of 1650, p. 110). "In December, 1642, the General Court, after expressing their approbation of what had been done by the Particular Court, as agreeable to the general power previously granted to them, proceeded to pass an act . . . . After the establishment of the County Courts, the cognizance of this offence was transferred to them." Statutes, 1808, p. 457 n.

In its original form, the lascivious carriage statute on its face appears to be residual, falling, as it does, at the end of the list of "Capitall Lawes." Other interdictions relating to sexual behavior deal with bestiality, homosexuality, adultery and rape— all capital crimes. Conn. Code of 1650, pp. 28, 29. Fornication was prohibited and punished "either by injoyning to marriage, or fyne, or corporall punnishment, or all . . . ." Conn. Code of 1650, p. 48. Each statute was intended to regulate and control an exclusive area of sexual conduct, and only that area. On the other hand, the lascivious carriage statute, being residual, was a general prohibition against all other acts loosely described as lascivious. Statutes, 1821, p. 164 n. The 1784 statute, entitled "An

Act for the Punishment of lascivious Carriage and Behaviour," contained the following preamble: "For the preventing of lascivious Carriage and Behaviour, against and for the Punishment of which, (in Regard to the Variety of the Circumstances) particular and express Laws cannot be easily suited and made." Statutes, 1784, p. 124. The act read: "Be it enacted by the Governor, Council and Representatives, in General Court assembled, and by the Authority of the same, That the several and respective County Courts within this State, shall be, and are hereby impowered and directed to proceed against, and punish such Persons as shall be guilty of lascivious Carriage and Behaviour; either by imposting a Fine on them, or by committing them to the House of Correction, or by inflicting corporal Punishment on them, according to the Nature and Aggravation of the Offence, and according to the Discretion of such Court: That such seasonable and exemplary Punishment may be inflicted upon Offenders in that Kind, that others may hear and fear."

Against such a historical background, *Fowler* v. *State,* 5 Day 81, the only Connecticut decision which attempted to give the lascivious carriage statute judicial interpretation, was handed down in June, 1811. The court interpreted the statute in this way (p. 84): "Although, from the indelicacy of the subject, and the different shades of criminality attending the offense, the legislature have avoided a definition of lascivious carriage and behavior; yet, it is evident from the preamble to the act, and the plain import of its expressions, that they meant to include and suppress all those wanton acts, between persons of different sexes, flowing from the exercise of lustful passions, which are grossly indecent and unchaste; and which are not otherwise punished as crimes against chastity and public decency." Al-

though the interpretation is in general terms, the court seemed to place two limitations upon the application of the statute—limiting it to heterosexual behavior and to behavior not otherwise punished as a crime.

By 1821, the statute had attained a modern form. Statutes, 1821, p. 164. Discretion as to punishment was limited. The purposeful preamble was omitted. The seriousness of the offense was downgraded. At the same time, the range of specific sexual crimes had widened; for example, statutory rape and assault to commit rape were added to the statutes. Statutes, 1821, p. 152. In 1871, the residual scope of the lascivious carriage statute was significantly cut by the passage of an act which punished a person who did "wantonly and indecently expose his person in sight of any dwelling house or public highway." Public Acts 1871, c. 106. In 1875, lascivious carriage and fornication were joined in one statute. Rev. 1875, p. 511, § 5. In subsequent revisions, except for relatively minor changes, its content was retained intact. Rev. 1888, § 1528; Rev. 1902, § 1315; Rev. 1918, § 6383; Rev. 1930, § 6231; Rev. 1949, § 8553.

The legislative history of § 53-219 leads us to the conclusion that to constitute the crime of lascivious carriage or behavior under our law, the carriage or behavior referred to in the statute was intended to apply only to conduct between persons of different sexes. It may well be that the defendant's conduct in this case may be punishable by some other statute, but not by the one in question. We look upon the construction of old statutes as law not to be interfered with by us. Furthermore, the authorities support such a construction. *Fowler* v. *State,* 5 Day 81; *Zeiner* v. *Zeiner,* 120 Conn. 161 (heterosexual behavior); *State* v. *Curtis,* 146 Conn. 365, 369; 2 Swift, Digest, p. 343; 2 Wright, Conn. Jury Instruc-

tions § 716; Bishop, Statutory Crimes (3d Ed.) §§ 713, 714; Law Lexicon (1940 Ed.) p. 706. We are not unmindful that in *Koa Gora* v. *Hawaii,* 152 F.2d 933, cert. denied, 328 U.S. 862, the defendant's conviction for an act of homosexual aggression to an unconsenting person was sustained under the Hawaiian statute. We are bound, however, to abide by the construction in *Fowler* v. *State,* supra.

The defendant, with regard to the second count, assigns error in the court's conclusion that the defendant gave a police officer a false report within the meaning of § 53-168, which provides: "Any person who knowingly makes to any police officer . . . a false report . . . alleging that a crime or crimes have been committed" shall be punished. Neither the state nor the defendant has drawn our attention to any authorities upon the question raised before us. Our own independent research has led us to two California cases. In *People* v. *Smith,* 131 Cal. App. 2d 889, the defendant was convicted of violating a section of the Los Angeles Municipal Code (§ 52.50) which provided: "No person shall wilfully make to the Police Department . . . any false . . . report . . . ." The defendant made false statements at the scene of an automobile accident in response to inquiries addressed to him by investigating officers in respect to the identity of one of the drivers involved in the accident. Upon appeal, the conviction was set aside. The court held (p. 891) that "[w]hile not entirely free from doubt, we have concluded that if it had been the intent of the city council to proscribe conduct such as that disclosed by the evidence here, it would have used language substantially different from that which it did. It seems reasonable that in such circumstances it would have provided that it should be unlawful for any person to willfully make a false statement to a police officer . . . rather than using the word 'report,' which in its context,

at least, seems to connote a statement written or oral made upon the initiative of one who resorts to the police department or a member thereof for the specific purpose of having some action taken with respect thereto rather than by way of response to questions by an officer—such as a missing person report or a report that a particular crime has been committed, like loss of his property as a result of robbery or burglary, or an auto accident. Otherwise, every person who undertook to reply to a question put to him by a police officer would subject himself to the possibility of being charged with a misdemeanor under the section, the not unlikely result of which would be to discourage persons interrogated to make answer, with the result that the detection of crime would be made more difficult rather than facilitated." In *People* v. *Minter,* 135 Cal. App. 2d 838, the defendant appealed his conviction of a violation of the same section of the code. He had come, however, upon his own initiative to the internal affairs division of the police department and was interviewed by the officer in charge of that office. The defendant stated that he had been convicted of the crime of driving under the influence of intoxicating liquor by reason of the perjured testimony of a named police officer. Upon appeal, he claimed to come within the rule of *People* v. *Smith,* supra. The court held (p. 843): "Here, it is plain, from the evidence of the prosecution, that there was 'a statement, written or oral, made upon the initiative of one who resorts to the police department . . . for the specific purpose of having some action taken with respect thereto,' and hence there was a report within the meaning of the municipal code." The conviction was reversed on other grounds.

These cases, if followed by us, would seem to sustain the defendant's position and require a reversal.

In our opinion, however, the distinction made in the California cases exalts technicalities over substance. "To 'report' means to give an account of, to relate, to tell." *Bowles* v. *Jung*, 57 F. Sup. 701, 706. "To 'report' means to convey or disseminate information and desired information which is locked up in one's breast and not disclosed is not 'reported.'" *Hasbrouck Heights Hospital Assn.* v. *Hasbrouck Heights*, 15 N.J. 447, 455. It is true, of course, as urged by the defendant in his brief, that he was under no compulsion to give information to a police officer; however, he elected to do so, and, having made that election, he was under a legal obligation not to give a false account of the events of that night. It is difficult for us to approve the melancholy observation of the California court in *People* v. *Smith*, supra, that replying to questions put by a police officer in the discharge of his duties might subject a citizen to a charge of making a false report and thereby make the detection of crime more difficult. It is clear from the facts in this case that the defendant made a false report, not on some inconsequential detail, but rather in relation to a vital and substantial occurrence which was calculated to mislead the police in the performance of their duties. This he may not do.

There is no error as to the second count; there is error as to the first count; the case is remanded with direction to modify the judgment as to the first count to adjudge the defendant not guilty on that count.

In this opinion PRUYN and GEORGE, Js., concurred.