## Demharter, Appellant, *v.* First Federal Savings & Loan Association of Pittsburgh, Appellant.

Argued June 5, 1963. Before BELL, C. J., MUSMAN-NO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Louis E. Sensenich,* with him *H. Reginald Belden,* and *Smith, Best & Horn,* for plaintiffs.

*Myron W. Lamproplos,* with him *Samuel M. Jackson, James C. Larrimer,* and *Cassidy & Lamproplos,* for defendant.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 9, 1963:

These two appeals are from a decree of the Court of Common Pleas of Westmoreland County. One appeal[1] challenges the propriety of that portion of the decree which upholds the validity of a sheriff's sale; the other appeal[2] challenges the propriety of that portion of the decree which directs the payment of $47,-216.30.

---

[1] No. 57 March Term, 1963.

[2] No. 31 March Term, 1963.

Leo Klemzak and Antonio Iacino, partners trading as Keystone Construction & Supply Company (Keystone), owned 76 lots in a development known as Greene Hill, located partly in Hempfield Township and partly in Greensburg City, Westmoreland County. On April 24, 1956, Keystone, contemplating the construction of 76 dwellings in Greene Hill, executed a construction loan agreement (Agreement), a bond and a mortgage with the First Federal Savings and Loan Association of Pittsburgh (First Federal). The amount of the bond and mortgage and the amount to be advanced under the Agreement by First Federal was $1,363,420. This mortgage (original mortgage), recorded April 25, 1956, erroneously recited that the 76 lots were located in Hempfield Township, although in the recorded Greene Hill plot plan, specifically referred to in the mortgage, the lots were correctly shown to be located partly in Hempfield Township and partly in Greensburg City. Construction of the dwellings commenced on April 30, 1956.

To correct the mistaken recitation as to the geographical location of the lots in the original mortgage, a second mortgage (corrective mortgage) was recorded on May 26, 1956. Such correction constituted the only difference between the original and the corrective mortgage.

As the construction of the dwellings progressed, First Federal made payments to Keystone; at first, in accordance with a payment schedule contained in the Agreement and, later, under a modified payment schedule.

From April 30, 1956 until June 12, 1957, First Federal had no notice of any unpaid indebtedness owed by Keystone to suppliers of materials and labor.[3] On June 12, 1957, counsel for one supplier of material told

---

[3] With the exception of one claim which Keystone paid.

a First Federal official that his client had a substantial unpaid claim against Keystone and he informed the First Federal official that he would attempt to ascertain whether any other suppliers had not been paid. Approximately, one month later, counsel for another supplier of labor and material mailed a letter to each of thirty-five creditors of Keystone enclosing a list of creditors to whom Keystone, purportedly, was indebted to the extent of $250,000. A copy of this letter and list was given to First Federal on July 15, 1957.

During the period from the middle of July until October, 1957, several meetings were held by Keystone creditors with First Federal officials. At these meetings, as the court below found upon supportable evidence, First Federal did not commit itself in any way to allow Keystone's creditors to continue construction or to make direct payments to them nor did First Federal assume any obligation whatsoever to them.

By August 8, 1957, eleven homes had been completed and sold, three homes had been completed but not sold, and twenty-seven homes had been partially completed. On that date, First Federal confessed judgment on the bond, executed April 24, 1956, in the sum of $475,695.66 and filed an affidavit of default alleging, inter alia, that Keystone was in default in interest as of August 1, 1957, in the amount of $3,-071.47. The certificate attached to the D.S.B. confessing judgment recited that the mortgage which the bond accompanied had been recorded May 26, 1956, i.e., the corrective mortgage.

Within the next several weeks various mechanics' liens were filed against dwellings in the construction area.

A sheriff's sale of the properties, originally scheduled for September 27, 1957 but continued at first by agreement and later by court order, was held on October 11, 1957 and, at that sale, the properties were sold

to First Federal. It is to be noted that, on that same day, Keystone's creditors, representing claims totalling $254,435, executed a creditors' composition agreement.

On December 6, 1957, on First Federal's petition, the Court of Common Pleas of Westmoreland County permitted an amendment of the certificate attached to the D.S.B. confessing judgment to show that the bond upon which the execution had been issued *also* accompanied the original mortgage.

At the time of the sheriff's sale, as the court found on supportable evidence, there remained in First Federal's loan account, earmarked for the completion of uncompleted dwellings, $71,502. Thereafter, First Federal spent $71,337.13 to finish the uncompleted dwellings and $4,767 for replacement of a sewer and extra landscaping. At the time of trial First Federal still had a net amount of $136,153.44 invested in the remaining homes and lots which then had a fair market value of $124,620. Subsequent to June 12, 1957, when First Federal first learned that one supplier of labor and material had not been paid, First Federal paid Keystone $47,216.30.

On March 10, 1958, on petition of First Federal, the court directed the sheriff to deliver a deed to First Federal and approved First Federal's $275,000 bond.

On June 28, 1958, Keystone's creditors and mechanics' lienholders[4] (plaintiffs), instituted an equity action against Keystone[5] and First Federal in the Court of Common Pleas of Westmoreland County wherein plaintiffs requested the court: (a) to declare invalid the judgment entered upon the bond upon which the sheriff's sale took place, or, in the alternative, to direct distribution of the proceeds of the sale to plaintiffs to the extent of their mechanics' liens; (b) to de-

---

[4] Some later intervened in the action.

[5] Keystone, apparently, from its inception has taken no part in this action.

clare void and set aside the sheriff's sale, or, in the alternative, to award damages to plaintiffs. Dismissal of preliminary objections to the equity complaint was affirmed by our Court in *Demharter v. First Federal Savings and Loan Association,* 395 Pa. 400, 150 A. 2d 354.

After various hearings, the chancellor entered a decree, later affirmed by the court en banc, which held: 1. That First Federal's judgment against Keystone and the sheriff's sale were valid and that, by virtue of such sale, First Federal acquired a fee simple title to the properties; 2. That First Federal must pay plaintiffs, in proration to the amounts owed them by Keystone, $47,216.30, i.e., the amount paid to Keystone by First Federal subsequent to June 12, 1957. From the first portion of the decree plaintiffs appeal; from the second portion of the decree First Federal appeals.

### The Validity of the Judgment and Sheriff's Sale

The attack upon the validity of the judgment entered on the bond and the sheriff's sale is based upon several grounds: (1) that the court order—which permitted the certificate attached to the D.S.B. confessing judgment to be amended to show that the bond accompanied *both* the original and the corrective mortgage—was obtained upon a false averment and ex parte; (2) that, at the time of issuance of execution, Keystone was either (a) not in default on the mortgage or (b) a default had been artificially created; (3) that First Federal and Keystone had acted in collusion to bring about the execution.

The record discloses that the petition, which requested the amendment, did aver that the execution of the corrective mortgage had taken place *on* April 24, whereas, in fact, such mortgage had been executed sometime *after* April 24th and *prior* to May 26th. The

real thrust of plaintiffs' argument is that, if this amendment had not been allowed, execution would have been upon the corrective mortgage which was junior in lien to plaintiffs' mechanics' liens since construction of the dwellings had been commenced prior to recordation of the corrective mortgage. We are in full agreement with the conclusion of the court below: "The allegation that the corrective mortgage was executed on April 24, 1956, was not material to the granting of said amendment as the Court was merely allowing the record to be amended so as to set forth the fact that First Federal was executing on the lien of the original mortgage." Regardless of the inaccuracy of the averment as to the date of execution of the corrective mortgage, the court properly permitted the amendment. The corrective mortgage simply corrected a recital in the original mortgage as to the location of the lots, a correction which, in view of the reference in the original mortgage to the correct location of the lots in the Greene Hill plan, was not necessary. The court-permitted amendment related the bond, upon which the execution was issued, to the original mortgage, the bond having been executed and delivered contemporaneously with the original mortgage. That which Mr. Justice Musmanno stated in *Peoples Natural Gas Company Appeal*, 399 Pa. 226, 234, 160 A. 2d 391, is presently apt: "The attainment of justice is over the highway of realities and not through the alley of technicalities."

The allowance of this amendment did not prejudice plaintiffs. When work commenced on this project, the original mortgage, covering all the lots, was on record. Even if plaintiffs did not have actual notice, they did have constructive notice of the lien of this mortgage. Proper recordation of a mortgage gives constructive notice to all persons of that which the record contains: *Stephen's and Wife's Appeal*, 87 Pa. 202; *Kuhn's Ap-*

*peal,* 2 Pa. 264. Recordation of First Federal's original mortgage gave notice to plaintiffs of the prior lien against the lots and the amendment effected no change in plaintiffs' position. Even if the amendment was granted ex parte, such amendment did not prejudice plaintiffs' rights.

In its grant of the amendment and in the manner in which it granted the amendment the court below acted with propriety.

Plaintiffs' next argument is directed to First Federal's *right* to issue execution. This argument is two-fold: (a) Keystone had not defaulted in the payment of interest or (b) the default was artificially created. As to (a), the evidence of record fully and adequately supports the chancellor's finding of fact, approved by the court en banc, that, on August 8, 1957, Keystone was in default in the payment of interest for more than thirty days and in their obligation to proceed diligently with the construction of the dwellings; such finding is binding upon us. As to (b), plaintiffs contend that, subsequent to June 12, 1957, First Federal made some payments to Keystone from which it should have deducted any interest due, hence any default in the payment of interest, was artificial. Our attention has not been directed to any legal obligation on the part of First Federal, under the circumstances, to withhold interest from such payments and there is no evidence that Keystone's default in the payment of interest was of artificial creation.

Lastly, it is charged that Keystone and First Federal acted in collusion when "it became apparent to [Keystone and First Federal] that the houses being built were not selling and that the whole program was unsound." We have carefully searched this record and find no evidentiary support for this charge. Suspicion and surmise cannot take the place of proof so as to justify a court in setting aside the use of its judicial

process initiated to secure the payment of an indebtedness when the employment of such judicial process is clearly justified under the provisions of the agreement between the parties, once a default in payment of the indebtedness has occurred.

We find no reason to declare invalid either the judgment as entered, the execution as issued thereon or the sheriff's sale and, therefore, the decree of the court in this respect is affirmed.

## The Propriety of the Decree Directing First Federal To Pay Plaintiffs the Amount of Moneys Paid Keystone After June 12, 1957

On June 12, 1957, First Federal learned for the first time that one of Keystone's subcontractors and materialmen was owed a substantial amount of money. On or about July 15, 1957, First Federal was shown a letter enclosing a list of creditors to whom, purportedly, Keystone then owed $250,000. Between June 12th and July 15th, First Federal did pay, under the Agreement, either directly or indirectly, $36,992.30 and, between July 15th and July 29th, $10,224 to Keystone, a total of $47,216.30. During the time within which these payments were made, admittedly, First Federal did not require Keystone to produce any release of liens or receipted bills from the plaintiffs.

The court below concluded that First Federal, aware that Keystone had not paid them, was under an "equitable duty" to protect subcontractors and materialmen, such as the plaintiffs, and, therefore, First Federal "no longer acted in good faith, and was guilty of gross negligence." On the basis of that conclusion, the court directed First Federal to pay to plaintiffs an amount of money equal to that paid by it to Keystone after June 12, 1957.

Plaintiffs take the position that First Federal is liable on several grounds: (a) that, under the Agree-

ment, First Federal was liable to plaintiffs as third party beneficiaries; (b) that, under the Agreement, First Federal had no *right* to pay Keystone because Keystone was the "owner" and not a "contractor" to whom payment could rightfully be made; (c) the rule that " 'where one of two innocent persons must suffer loss for the fraud of a third, the loss should fall on the one whose act facilitated it' " governs the instant case. On the other hand, First Federal contends: (a) that the Agreement imposed no *obligation* on First Federal to pay plaintiffs in *any* capacity; (b) that, under the Agreement, Keystone occupied the dual capacity of "owner" and "contractor"; (c) that the equitable rule relied on by plaintiffs was inapplicable.

Under the Agreement, the parties agreed, inter alia, that First Federal should: "8. Pay out of the funds to contractors, subcontractors, or materialmen, *as the [First Federal] may elect,* for work performed, services rendered, and materials furnished in and about the construction of the building. Such payments shall be made at such times and in whatever amounts the [First Federal] may deem expedient, . . . it being the intention of the parties hereto that the [First Federal] shall be free to make the payments . . . in such manner that the [First Federal's] security shall at all times be protected." (Emphasis supplied). Furthermore, the Agreement provided: "(G) That the [First Federal] shall assume no liability whatsoever to the Owner, his contractors, subcontractors and materialmen, or others, except for its gross negligence and malfeasance in the application of said funds . . . ."

Paragraph 8 clearly spells out that the determination *whether any payment should be made* to persons in plaintiffs' status and, if so, *when* and *in what amount* rested exclusively within the discretion and the judgment of First Federal. First Federal had the *right,* at its election, to make such payments, but not

the *duty* to do so. Nothing in this Agreement *obligated* First Federal to make any payment to any "subcontractors" or "materialmen", whether they be in the status of third party beneficiaries or not. If, *and only if*, First Federal elected to do so would any payment be made. This Agreement contains no actionable promise to the suppliers of labor and materials which can be enforced by them. The *right to pay* is vastly different from the *duty to pay;* only the latter can be enforced. In this respect, the case at bar is clearly distinguishable from *Kreimer v. 2nd Federal Savings and Loan Association,* 196 Pa. Superior Ct. 644, 176 A. 2d 132, upon which plaintiffs rely; in *Kreimer,* the contract imposed an *obligation* and a *duty* to make payment to those who supplied labor and materials.

Under Paragraph G. First Federal is relieved of all liability whatsoever to persons in plaintiffs' status except it be guilty of gross negligence or malfeasance in the application of the funds. Nothing in the instant factual situation would support a finding either of "gross negligence" or "malfeasance" on the part of First Federal.[6]

Was Keystone an owner, a contractor, or both, within the intendment of the parties to the Agreement? Plaintiffs say that Keystone was only an owner to whom First Federal had no right, under the Agreement, to pay out funds, the class to receive such payments being "contractors, subcontractors or materialmen". True, Keystone was the owner of these properties but under the Agreement, he was also a contractor. By the insertion into this Agreement—typewritten on

---

[6] The court below erred in its equation of a "lack of good faith" with "gross negligence". As Mr. Justice STORY, in Commentaries to the Law of Bailments, stated (p. 27) : ". . . gross negligence is. or, at least, may be entirely consistent with good faith and honesty of intention. And it would be a most mischievous error to confound it with fraud. . . ."

the printed Agreement—of the phrase "Owners are Own Contractors" the parties recognized and acknowledged the dual capacity in which Keystone was to act in the performance of the Agreement. Insofar as First Federal was concerned, Keystone was intended to act in this dual capacity. Previous to June 12, 1957, First Federal made payments out of the fund to Keystone, a recognition by First Federal that, under its construction of the Agreement, it had a right to do so. Under the construction placed by the parties on the capacity in which Keystone was to act under this Agreement, Keystone was both an owner and a contractor. In the case of doubtful construction, the construction placed upon a contract by the parties themselves is worthy of great consideration and generally will be adopted, particularly when such construction is made prior to the occurrence of any controversy or litigation: *Maguire v. Osborne*, 384 Pa. 430, 439, 440, 121 A. 2d 147. *Owen & Salter v. Johnson*, 174 Pa. 99, 34 A. 549, *Duff v. Hoffman*, 63 Pa. 191 and the definitions of "owner" and "contractor" under the Mechanics' Lien Law,[7] upon which plaintiffs rely, do not alter the parties' intent so clearly manifested in this Agreement and their own construction thereof as to the meaning of "owner" and "contractor" insofar as Keystone was concerned.

Lastly, does the rule that, where one of two innocent parties must sustain a loss from the fraud of a third, the loss should fall on the one whose act has enabled such fraud to be committed, have any application to the case at bar? In *Fifth Street Building and Loan Association v. Kornfeld*, 315 Pa. 406, 172 A. 703, Mr. Justice (later Chief Justice) MAXEY, speaking of this rule, said (p. 412): "A typical example of the

---

[7] Acts of June 4, 1901, P. L. 431, §1, and May 2, 1929, P. L. 1255, No. 433, §1, 49 PS §§2, 3.

proper application of this rule is in a case where A put B in possession of something of value under circumstances which make it appear that B owned, or at least had the authority to dispose of, this valuable thing, and B did fraudulently dispose of it to C, an innocent purchaser, for a good consideration, and then A sues C for the value of this thing, or seeks to recover it in an action of replevin. In such a case it is a good defense for C to show that A, by his carelessness, put B in a position to perpetrate the fraud complained of and whose evil results must fall on either A or C". *Gramigna v. Board of Ministerial Pensions*, 330 Pa. 335, 199 A. 2d 177, upon which plaintiffs rely, is typical of that situation but is presently inapposite.

The case at bar does not present a situation which calls for the application of that rule. An examination of the record discloses no evidence upon which any finding of fraud, bad faith, or carelessness on First Federal's part, could be predicated. The record indicates that Keystone's indebtedness to *some* of the plaintiffs had extended since the beginning of 1957. There is not a scintilla of evidence that *any* of the plaintiffs between June 12 and July 29 extended any further credit to Keystone in reliance on any promise, express or implied, on First Federal's part that it would pay to them Keystone's indebtedness, in whole or in part. Not one of the plaintiffs ever requested First Federal to withhold payments to Keystone or to make payments to them directly. On this state of the record, it is inconceivable how any "equitable duty" could arise on the part of First Federal to withhold payments from Keystone and make such payments directly to plaintiffs. The paternalistic duty which the court below would impose must find some basis in fact and in law; such basis is lacking.

The extent and nature of the duties owed by First Federal are described and delineated in the Agreement.

The Agreement imposed no duty on First Federal to pay plaintiffs although it did grant it the right to do so, if it so chose. In paying Keystone, First Federal did that which it had a right to do under the Agreement; in not paying plaintiffs directly, First Federal did that which it had a right to do. It has not been shown that, in reliance on anything which First Federal said or did, plaintiffs, to their detriment, changed their position. The unfortunate failure of Keystone to live up to its obligations to its creditors in nowise fastens liability upon First Federal.

We repeat that this record is barren of any basis for a finding or conclusion that First Federal lacked good faith, was grossly negligent or guilty of malfeasance in the application of the funds. Under such circumstances, there is no basis upon which First Federal can be held liable for the payment to plaintiffs of an amount of money equal to the amount which it paid to Keystone after June 12, 1957 and that portion of the court's decree which directs such payment must be reversed.

That portion of the decree upholding the validity of the sheriff's sale is affirmed, while that portion of the decree directing payment to plaintiffs of $47,216.30 is reversed.

Decree, as modified, affirmed. Each party to pay own costs.