**TREVDAN BUILDING SUPPLY,**
Appellant

v.

**TOLL BROTHERS, INC. t/d/b/a Toll Bros., Inc., Toll PA IV LP, Toll PA VI LP, and Its Related Entities, Members, Partners, and Subsidiaries.**

**Gulf Coast Bank and Trust Company d/b/a Gulf Coast Business Credit,**

v.

**Toll Brothers, Inc., Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 6, 2009.
Filed May 28, 2010.

Larry L. Miller, Duncannon, for appellant. (submitted)

Edith A. Pearce, Philadelphia, for Gulf Coast Bank, appellee.

Scott Rothman, Conshohocken, for Toll Brothers, appellee.

BEFORE: STEVENS and BOWES, JJ., and McEWEN, P.J.E.

OPINION BY BOWES, J.:

¶ 1 Trevdan Building Supply ("Trevdan") appeals from the order granting the counter-petition for payment in an interpleader proceeding filed by Gulf Coast Bank and Trust Company d/b/a Gulf Coast Business Credit ("Gulf Coast"). That same order divided the interpleaded funds totaling $118,934.00 as follows: Gulf Coast was awarded $89,194.00; Toll Brothers, Inc. ("Toll Brothers") received $15,000.00 for attorneys' fees; and Trevdan was granted the remaining $14,740.00. We reverse and remand with directions. We also deny Gulf Coast's motion for sanctions.

¶ 2 The pertinent facts and procedural history follows. Houston Drywall, Inc. ("Houston Drywall") contracted with Toll Brothers to perform drywall work on two of Toll Brothers's residential construction projects. Thereafter, Houston Drywall entered into an agreement with Trevdan, wherein Trevdan would supply Houston Drywall with building materials to be used on the construction projects.

¶ 3 On September 27, 2004, Houston Drywall executed a "Receivable Purchase Agreement" with Gulf Coast, wherein Houston Drywall effectively sold to Gulf Coast its rights to unpaid present and future invoices, including unpaid invoices owed by Toll Brothers. On October 1, 2004, Gulf Coast perfected its security interest in the unpaid invoices by filing a financing statement pursuant to Article 9 of the Uniform Commercial Code ("UCC"). Gulf Coast subsequently sent Toll Brothers notice of the assignment and directed that all future payments to Houston Drywall be issued to Gulf Coast directly.

¶ 4 Houston Drywall ceased operations on September 2, 2005, and Trevdan immediately demanded that Toll Brothers satisfy the balance Houston Drywall owed to Trevdan for the supplies it had delivered to the Toll Brothers's construction projects to that date. Under the terms of the construction contract with Houston Drywall, Toll Brothers was authorized to pay Trevdan directly and charge the payments

against the invoices owed to Houston Drywall. However, after Toll Brothers refused to distribute the funds, Trevdan filed the underlying complaint against Toll Brothers on October 11, 2005, wherein it sought payment of $128,653.16 for materials supplied to the construction projects on Houston Drywall's behalf. More than two months after Houston Drywall ceased operations and Trevdan first issued its demand to Toll Brothers for payment, on November 17, 2005, Houston Drywall issued notice of the voluntary bankruptcy petition it filed under Chapter Seven of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, wherein it identified the outstanding invoices as assets within the bankruptcy estate and listed Trevdan as an unsecured creditor. On December 28, 2005, Gulf Coast obtained relief from the automatic bankruptcy stay and filed a civil complaint against Toll Brothers on February 17, 2006, seeking payment of Houston Drywall's outstanding invoices pursuant to the "Receivable Purchase Agreement."

¶ 5 Meanwhile, on January 10, 2006, the trial court granted Toll Brothers's petition for interpleader and added Gulf Coast as a party plaintiff. On February 28, 2006, Trevdan filed a petition for payment. Gulf Coast filed a counter-petition for payment on August 23, 2006. On December 18, 2006, the trial court denied Trevdan's petition for payment. This Court quashed Trevdan's subsequent appeal. Thereafter, on January 8, 2008, the trial court ordered Toll Brothers to interplead $118,934.00 into court; it discharged Toll Brothers from all liability to Trevdan and Gulf Coast in this action; and it dismissed Toll Brothers from the proceeding. In an order dated January 14, 2009, the trial court granted Gulf Coast's counter-petition for payment and ordered the interpleaded

funds to be distributed as referenced above.

¶ 6 This timely appeal followed on January 29, 2009. Trevdan complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.1925(b) on February 27, 2009.[1]

¶ 7 As our review of this matter involves a question of law, whether Gulf Coast's security interest in Houston Drywall's invoices was superior to Trevdan's equitable claim to the interpleaded funds, our standard of review is *de novo*, and our scope of review is plenary. *See Dooner v. DiDonato,* 601 Pa. 209, 971 A.2d 1187, 1193 (2009) (Supreme Court exercised *de novo* review over question of law concerning whether federal securities law preempted common law tort claim).

¶ 8 With regard to interpleader proceedings initiated pursuant to Pa.R.C.P. 2301–2324, our Supreme Court noted in *Williard, Inc. v. Powertherm Corp.,* 497 Pa. 628, 444 A.2d 93, 96 (1982),

> It is a basic principle that the rights of claimants to an interpleaded fund must be determined on their own merits. *Slavin v. Slavin,* 368 Pa. 559, 84 A.2d 313 (1951). Thus, before an issue of priority among claimants is properly presented, it must be determined whether each of the claimants has a cognizable interest in the fund.

¶ 9 Herein, Trevdan presents three questions for our review:

> A. Was Trevdan, an unpaid materialman, entitled to direct payment for its materials from the owner, Toll [Brothers]?
>
> B. Does an unpaid supplier, Trevdan, have priority to remaining contract funds on the project over a secured

---

**1.** Trevdan also filed a motion for reconsideration, which the trial court did not address.

creditor, Gulf Coast, in receivables due a contractor?

C.   Did the lower court commit error in awarding the owner, Toll [Brothers], its expenses and fees when they were unnecessarily incurred ... in bad faith?

Trevdan's brief at 4.

¶ 10 The crux of Trevdan's complaint is that since Gulf Coast's claim to the disputed funds derives from Houston Drywall, its claim cannot rise above Houston Drywall's claim.   Relying upon several cases addressing similar issues, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965), and *Williard, Inc., supra,* Trevdan argues that under established common law principles concerning unpaid subcontractors and materialmen, once Trevdan performed its obligation to deliver supplies to the project, neither Houston Drywall nor Gulf Coast as its assignee had a right to payment until Trevdan was first paid in full. Trevdan continues that it never received full payment for its performance, and therefore, Toll Brothers was not obligated to submit payment to Houston Drywall or its assignee because that payment never became due.   Moreover, Trevdan posits that since Houston Drywall's rights to the disputed funds were conditioned upon payment of the amounts due to unpaid materialmen which never occurred, the disputed funds never became a part of the bankruptcy estate.

¶ 11  In rejecting Trevdan's argument that it possessed an equitable lien against the disputed funds, the trial court summarized the holdings in *Pearlman* and *Jacobs* and correctly noted each case's application of the doctrine of equitable subrogation to elevate the materialmen's claims against contractors above the claims of other debtors.   However, the trial court then attempted to distinguish those cases from the facts herein because both *Pearlman* and *Jacobs* "involved public contracts in which the complaining party was a surety who had stepped into the shoes of the contractor and paid the [materialmen]." *See* Trial Court Opinion, 2/16/07, at 4; Trial Court Opinion, 3/20/09, at 5.   The trial court further reasoned that bonds were in place in both cases to insure that the sureties were reimbursed and that the underlying construction contracts conditioned the government's payment upon the contractor satisfying payment to the materialmen. As the instant case did not involve a public contract and Trevdan was not a surety of Houston Drywall, the trial court concluded that the rationale underlying *Pearlman* and *Jacobs, i.e.,* that unpaid laborers and materialmen have an equitable lien against funds retained by owner, is not applicable herein.

¶ 12 Next, the trial court reasoned that Trevdan's reliance upon our Supreme Court's rationale in *Williard, Inc.* was unavailing because the contract language in that case required the contractor to provide proof that it had paid the subcontractors and employees before it was entitled to payment, and the contract gave the owner the right to retain funds that it believed were owed to the unpaid subcontractors.   In that case, our Supreme Court held that the contractor's failure to provide the owner proof that it paid the subcontractors was tantamount to a material breach of the contract between the owner and contractor, which permitted the owner to withhold payment.   Significantly, the subcontractor was not a party to the construction agreement.   Nonetheless, based upon the terms of the construction agreement and the contractor's default, our Supreme Court concluded that the contractor did not have a cognizable interest in the contract balance that the owner interpleaded into court.   Instead, the Supreme

Court held, "only [the twelve unpaid subcontractors] have a cognizable interest in the fund." *Williard, Inc., supra* at 97.

¶ 13 In attempting to distinguish *Williard, Inc.* from the facts underlying the case at bar, the trial court concluded that the construction agreement between Toll Brothers and Houston Drywall did not grant Trevdan an exercisable right to the disputed funds, but rather merely permitted Toll Brothers to pay the disputed funds if it desired. Thus, the trial court held that Toll Brothers acted reasonably in failing to pay Trevdan the disputed funds. As discussed below, we disagree.

■ ¶ 14 Our review of the relevant common law principles underlying the United States Supreme Court's decision in *Pearlman*, the Pennsylvania Supreme Court's holdings in both *Jacobs* and *Williard, Inc.*, and the pertinent portions of the construction contract between Toll Brothers and Houston Drywall, supports Trevdan's position. First, in contrast to the trial court, we disagree that the courts' respective holdings in *Pearlman* and *Jacobs* are distinguishable from the case *sub judice* because both of those cases involved sureties. Although the complainants in both of the cases were sureties, the respective sureties were advancing the equitable rights of the unpaid materialmen, who were reimbursed following the contractors' default. Hence, the rights at issue in *Pearlman* and *Jacobs* relate to the common law rights of materialmen and not a right specifically held by a surety. *See Pearlman, supra* at 141, 83 S.Ct. 232 (surety, having paid materialmen, was entitled to be paid out of fund government-owner retained to discharge contractor's debts for labor and materials); and *Jacobs, supra* at 52 (discussing the prevailing rule, "surety, upon payment of claims of labor and materialmen, is entitled to assert the benefits of subrogation against the funds

withheld by the [government-owner]"). Thus, although accurate, the trial court's observation that Trevdan is not Houston Drywall's surety does not affect the application of those cases to Trevdan's claim for relief. Simply stated, as an unpaid materialman, Trevdan holds an equitable lien against the contract funds Toll Brothers withheld during the construction project.

¶ 15 Similarly, beyond identifying the statutory bonding requirements of public works contracts, we are not persuaded that the United States Supreme Court's rationale turned upon the fact that the case involved a public contract. In *Pearlman*, the Supreme Court considered whether "Congress in passing the Miller Act [relating to performance and payment bonds on public contracts] intended to repudiate equitable principles so deeply imbedded in our commercial practices." *Pearlman, supra* at 140, 83 S.Ct. 232. The Supreme Court concluded that it did not. *Id.* Consequently, the statutory regime did not influence the Supreme Court's review of the common law issue, equitable subrogation.

■ ¶ 16 Likewise, having acknowledged the materialmen's equitable lien on unpaid contract funds, we find the duty to pay the unpaid materialmen exists both on private and public projects. Indeed, as Trevdan accurately observed, the inequities necessitating an equitable lien upon funds retained in the private sector are even greater because payment bonds are not required to be issued on private projects. Moreover, in reaching its decision in *Jacobs*, our Supreme Court recognized that in the absence of a surety bond, laborers and materialmen have priority to disputed contract funds over general creditors. *Jacobs, supra* at 54; *see also In re Modular Structures, Inc.*, 27 F.3d 72, 79 (3d Cir.1994) (applying *Pearlman* to New Jersey common law, "limitation of the eq-

uitable doctrine of subrogation only to public contracts would be illogical. The equitable obligation of the owner to pay subcontractors from contract funds remaining in the owners [sic] hands is not confined to government projects[.]"). Thus, although *Pearlman* and *Jacobs* concern public contracts, that is not a basis to distinguish the holding of these cases from the facts underlying the case herein.

¶ 17 Next, we observe that the contract rights our Supreme Court reviewed in *Williard, Inc.* are indistinguishable from the parties' contract rights herein. Our Supreme Court found the relevant terms of the contract in *Williard, Inc.* provided, *inter alia:*

> [P]rior to final payment the contractor shall furnish the owner with not only a "full and complete release of liens," but also "satisfactory evidence that all of Contractor's employees, subcontractors and suppliers of materials or equipment ... have been paid in full." ... [In addition,] failure "to make prompt payment to subcontractors or for material or labor" is a "substantial violation" of the contract for which the owner may, after giving 15 days' written notice, terminate the employment of the contractor, and for which the owner "shall have the right to retain out of any payment then due, or thereafter to become due to Contractor, an amount sufficient to pay such claim."

*Id.* at 635, 444 A.2d 93.

¶ 18 The pertinent provisions in the construction agreement between Toll Brothers and Houston Drywall similarly direct that as a condition of payment, Houston Drywall would certify that no mechanics liens have been or could be asserted against the project. *See* Construction Agreement at 1. Furthermore, the final payment would not be due until Houston Drywall delivered Toll Brothers a complete release of liens. *Id.* Article 5 of the construction contract directs Houston Drywall to satisfy all liens and claims, and it provides,

> "In the event that the [lien or claim] is not satisfied or removed from the record within forty-eight (48) hours after notice thereof ..., Toll shall have the right to pay all sums necessary to secure the satisfaction or removal of such lien or claim and to deduct such sums from the amount then due or to become due [Houston Drywall]."

*Id.* at 2. Similarly, Article 6(i) requires Houston Drywall to "pay promptly all sums due for labor, services materials, tools and equipment supplied in performance of the Work and, when required by Toll, submit to Toll satisfactory evidence of such payment ..." *Id.* Moreover, Article 7 provides,

> In the event [Houston Drywall] shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent ... or fail to make prompt payment for labor, services, materials, tools or equipment supplied in connection with performance of the Work ... Toll, two working days after notice to [Houston Drywall], shall have the right to (1) provide and pay for such labor, services, materials, tools and equipment ... to cure [Houston Drywall's] default hereunder and deduct the costs thereof from any payments due or to become due [Houston Drywall] and/or (2) terminate this Agreement and take possession of all materials, tools and equipment at the project for the purpose of completing the Work.

*Id.* Thus, upon review of the respective provisions, it is apparent the contract language in the case at bar parallels the pertinent portions of the contract before our Supreme Court in *Williard, Inc.* Both

contracts contain express conditions directing the contractor to pay its subcontractors, materialmen, and laborers and to certify that payment had been rendered as a condition of payment. In addition, pursuant to both contracts, failure to pay subcontractors and materialmen constitutes a material breach of contract that permits the owner to retain sufficient funds to satisfy the contractor's payment obligation. Thus, we find no basis to distinguish the case herein from the authoritative precedent our Supreme Court issued in *Williard, Inc.*

¶ 19 Simply stated, Houston Drywall's failure to provide Toll Brothers proof that it paid Trevdan for the materials it supplied to the construction project was tantamount to a material breach of contract that permitted Toll Brothers to withhold payment on the outstanding invoices. Applying the same reasoning to the present case as our Supreme Court utilized in *Williard, Inc.*, we find the contractor, Houston Drywall, lacks a cognizable interest in the contract balance that the owner, Toll Brothers, interpleaded into court. *See Williard, Inc., supra* at 97. Moreover, since Gulf Coast's claim to the disputed funds derives from Houston Drywall, we conclude that Gulf Coast also did not have a cognizable interest in the interpleaded funds.

¶ 20 Finally, we find that neither Gulf Coast's financing statement, nor Houston Drywall's voluntary bankruptcy petition, relegate Trevdan's equitable lien to the undistributed contract funds to an inferior status to Gulf Coast's claim. Although Gulf Coast purchased the rights to Houston Drywall's unpaid invoices and subsequently acquired a security interest in those accounts by filing a UCC financing statement, that secured interest applies only to payments **due** to Houston Drywall. While Gulf Coast argues that payment be-

came due upon Houston Drywall's performance of the work, this position utterly ignores the fact that final payment under the construction agreement is not due until Houston Drywall delivers to Toll Brothers a complete release of liens. *See* Construction Agreement at 1.

¶ 21 Additionally, Gulf Coast's position overlooks Houston Drywall's default of the construction agreement by failing "to make prompt payment for labor, services, materials, tools or equipment supplied in connection with performance of the Work ..." *Id.* at Article 7. Hence, Gulf Coast's right to payment of Houston Drywall's receivables never matured because Houston Drywall failed to satisfy its contractual obligations. Instead, Gulf Coast possesses a secured interest in an account that is not due until Houston Drywall can certify the complete release of liens. Indeed, as noted *supra*, consistent with our Supreme Court's reasoning in *Williard, Inc.*, we conclude that Gulf Coast does not have a cognizable interest to the funds that Toll Brothers interpleaded into court.

¶ 22 Similarly, Houston Drywall's bankruptcy petition does not elevate Gulf Coast's claim to the interpleaded funds. As Trevdan has argued consistently during this appeal, once it performed its obligation as materialman, Houston Drywall's and Gulf Coast's right to payment did not come due until Trevdan first was paid in full. In *Pearlman, supra*, the United States Supreme Court addressed whether funds retained by an owner to pay laborers and materialmen were part of the insolvent contractor's bankruptcy estate. After observing, "The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors[,]" the Supreme Court set about to determine whether the surety who paid the materialmen possessed an

equitable lien on the fund prior to the bankruptcy adjudication. *Pearlman, supra* at 135–36, 83 S.Ct. 232. The Supreme Court articulated the precise inquiry as follows:

> [I]f the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.

*Id.* at 136, 83 S.Ct. 232. Following a substantive analysis of the "deeply embedded" equitable principles that we referenced above, the Supreme Court concluded that the surety in *Pearlman* had a right to the retained funds. *Id.* at 136–40, 141–42, 83 S.Ct. 232. Essentially, the Supreme Court found that the funds were not a part of the bankrupt contractor's estate, but rather the funds became the surety's property when it satisfied the contractor's obligation to pay laborers and materialmen. *Id.*

¶ 23 We are also persuaded by the manner in which our sister jurisdictions have addressed this situation. In *In re C & C Excavating, Inc.,* 288 B.R. 251 (Bankr. N.D.Ala.2002), the United States Bankruptcy Court for the Northern District of Alabama confronted a similar scenario and held that the contract balance was not a part of the bankruptcy estate. The facts underlying *In re C & C Excavating, Inc.* parallel the facts in the case *sub judice* in that both involved a bankrupt subcontractor's failure to pay its second-tier subcontractors and suppliers on private, non-bonded construction projects. Like the instant case, the contract provisions in that case required the subcontractor to, *inter alia,* timely pay the second-tier subcontractors and materialmen, and permitted the general contractor, at its option, to satisfy those debts and charge it against the subcontractor. Furthermore, the subcontractor was required to indemnify the general contractor against any liens growing out of the performance of the work. *Id.* at 256.

¶ 24 As the subcontractor therein failed to pay its second-tier contractors and suppliers, the general contractor withheld the contract balance totaling $180,740.74. Thereafter, the subcontractor filed for bankruptcy protection. Hence, the bankruptcy court in *In re C & C Excavating, Inc.* confronted the precise issue that the trial court faced in the case at bar when it granted Gulf Coast's petition for payment: whether the contract balance was included in the subcontractor's bankruptcy estate.

¶ 25 Relying upon common law principles of contract and applicable case law including *Pearlman* and *In re Modular Structures, Inc., supra,* the bankruptcy court found that the contract funds were not property of the bankruptcy estate. The court reasoned that the subcontractor breached the construction agreement by failing to pay the second-tier subcontractors and that the general contractor had the contractual right to withhold the funds and pay the second-tier subcontractors and suppliers directly. *Id.* at 259–62. Thus, the bankruptcy court directed the general contractor to distribute the contract balance to the second-tier subcontractors and materialmen.

¶ 26 Accordingly, for the reasons that the United States Supreme Court identified in *Pearlman,* we conclude that Trevdan's equitable lien against the interpleaded funds preceded Houston Drywall's voluntary bankruptcy petition. Therefore, the funds would not be a part of the bankruptcy estate. Contrary to the trial court's position, *Pearlman* is not less persuasive because it originated in bankruptcy court. While the United States Bankrupt-

cy Code defines what property is included in the bankruptcy estate, as a threshold question, the bankruptcy courts "look to state law to determine if a property right exists and to stake out its dimensions." *In re Modular Structures, Inc., supra* at 77 (quoting *In re Nejberger,* 934 F.2d 1300, 1302 (3d Cir.1991)). As noted *supra,* our Supreme Court applied Pennsylvania law to a similar contract dispute in *Williard, Inc.,* and it concluded that based upon the terms of the construction agreement and the contractor's default, the contractor did not have a cognizable interest in the contract balance. Hence, pursuant to our state law, Houston Drywall does not have a property right in the interpleaded funds. Therefore, the trial court erred in granting Gulf Coast's counter-petition for payment.

¶ 27 Next, we address the portion of the January 14, 2009 order awarding Toll Brothers attorneys' fees pursuant to 42 Pa.C.S. § 2503(4), which provides in pertinent part as follows:

§ 2503. **Right of participants to receive counsel fees**

The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:

. . . .

(4) A possessor of property claimed by two or more other persons, if the possessor interpleads the rival claimants, disclaims all interest in the property and disposes of the property as the court may direct.

Herein, Toll Brothers's actions contributed to the expense it incurred in defending the rival claims. Absent Toll Brothers's delay in ignoring Trevdan's equitable claim to payment, as well as its refusal to exercise its undisputed contractual right to pay Trevdan and charge the payment against the invoices owed to Houston Drywall, Toll Brothers would not have incurred $15,000 in attorneys' fees in this matter. More-

over, assuming, *arguendo,* Toll Brothers was uncertain as to how to distribute the money *after* Houston Drywall issued notice of its bankruptcy petition and identified the disputed funds as assets within the bankruptcy estate, that does not explain or excuse Toll Brothers for ignoring its contractual rights and unreasonably withholding payment to Trevdan for the two months *prior* to the filing of the voluntary bankruptcy petition. Hence, we vacate the trial court's award of attorneys' fees.

¶ 28 For all of the foregoing reasons, we reverse the trial court's order granting Gulf Coast's counter-petition for payment and awarding Toll Brothers's attorneys' fees, and we direct the trial court to grant Trevdan's petition for payment and, if warranted, hold further proceedings to determine the precise amount due. Moreover, upon review of the reproduced record, we deny Gulf Coast's motion for sanctions challenging Trevdan's designation of the reproduced record.

¶ 29 Order reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 30 Judge STEVENS files a Dissenting Opinion.

### DISSENTING OPINION BY STEVENS, J.:

¶ 1 I conclude the trial court did not err in finding Gulf Coast has a superior interest to Trevdan to the funds being held by Toll Brothers for the work performed by Houston Drywall, and in addition, Toll Brothers was entitled to attorneys' fees under 42 Pa.C.S.A. § 2503(4). Therefore, I would affirm the order dividing the interpleaded funds as follows: Gulf Coast receiving $89,194.00, Toll Brothers receiving $15,000.00 for attorneys' fees, and Trevdan

receiving the remaining $14,740.000. Thus, I respectfully dissent.[1]

¶ 2 To summarize, I find that the relevant facts are as follows: Trevdan sold materials to Houston Drywall, who performed drywall subcontract work for Toll Brothers, a developer of residential properties. On September 2, 2005, Houston Drywall ceased operations; however, Toll Brothers continued to owe Houston Drywall money for materials, which Trevdan delivered to Houston Drywall for Toll Brothers' benefit in the residential projects. Trevdan sought money directly from Toll Brothers; however, Toll Brothers refused the request. In so doing, Toll Brothers informed Trevdan that, after Houston Drywall notified Toll Brothers of its intent to file for Chapter 7 bankruptcy, Toll Brothers terminated its contracts with Houston Drywall. Thereafter, Gulf Coast made a demand upon Toll Brothers indicating it had acquired the rights to and was the absolute owner of Houston Drywall's payments, which were allegedly due and owing to Houston Drywall from Toll Brothers.

¶ 3 Fearful it would be exposing itself to multiple liability for the same funds, Toll Brothers refused to release the money and litigation ensued. Specifically, Trevdan filed a civil complaint on October 11, 2005, Toll Brothers filed a petition for interpleader on December 6, 2005, and Gulf Coast filed a civil complaint on February 17, 2006.

¶ 4 In its complaint, Gulf Coast explained that it is a factoring business, which purchases accounts from businesses with which it has a contractual relationship. Gulf Coast averred it purchased from its factoring client, Houston Drywall, the unpaid invoices owed to it by Toll Brothers, and as such, Gulf Coast is an "account debtor" under the Uniform Commercial Code (UCC). Gulf Coast further averred Houston Drywall granted to Gulf Coast a continuing first lien, and on October 1, 2004, Gulf Coast filed a UCC Financing Statement with the Texas Secretary of State, thereby perfecting its security interest in the unpaid invoices owed to Houston Drywall from Toll Brothers. Gulf Coast sent a written notice of assignment to Toll Brothers of the fact Houston Drywall had assigned its present and future accounts to Gulf Coast and that all payments, including the payments at issue, due to Houston Drywall must be made directly to Gulf Coast. Gulf Coast further averred that, on November 17, 2005, Houston Drywall filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas, Houston, listing as an asset the monies owed to Houston Drywall by Toll Brothers and indicating Trevdan is an unsecured creditor. On December 28, 2005, Gulf Coast, as a secured creditor, obtained an order from the bankruptcy court granting Gulf Coast relief from the automatic stay imposed by Houston Drywall's bankruptcy filing.

¶ 5 Following litigation, the trial court entered an order directing that, of the $118,934.00 interpleaded into the court by Toll Brothers, Gulf Coast was to receive $89,194.00, Toll Brothers was to receive $15,000.00, and Trevdan was to receive $14,740.00. Trevdan filed this timely appeal.

¶ 6 On appeal, Trevdan avers it had a priority to the money, which had been interpleaded into court by Toll Brothers. Specifically, Trevdan contends that it had

---

1. I note that I agree with the Majority denying Gulf Coast's motion for sanctions with regard to Trevdan's reproduced record.

first priority to the undisbursed funds since, under common law, an unpaid supplier of materials has first priority. Trevdan argues Gulf Coast did not have first priority since Gulf Coast was an assignee, who merely "stood in the shoes" of Houston Drywall. That is, Trevdan contends Gulf Coast's priority to the undisbursed funds is no greater than Houston Drywall's right to the funds and, since Houston Drywall has no right to the funds since it breached its duty to pay Trevdan, Gulf Coast has no right to the funds. Trevdan also makes assertions that it is entitled to all of the funds as Toll Brothers was unjustly enriched, Trevdan was a third-party beneficiary of Houston Drywall's and Toll Brothers' construction contract, and Trevdan is an equitable assignee under the terms of Houston Drywall's and Toll Brothers' construction contract. In sum, based on various legal theories, Trevdan argues that the funds being held by Toll Brothers to pay Houston Drywall never became a part of the bankruptcy estate and were being held by Toll Brothers' for Trevdan's benefit.

¶ 7 In response, Gulf Coast avers that Trevdan is simply an unsecured creditor of a bankrupt debtor (Houston Drywall) and, therefore, Trevdan has no legal right to the funds interpleaded into court by Toll Brothers in payment of the invoices owed to Houston Drywall. Gulf Coast further argues that it has a security interest in the invoices and has obtained relief from the Bankruptcy Court's automatic stay. Gulf Coast notes that the automatic stay prevents secured and unsecured creditors from attempting to collect on the invoices, which were specifically listed as assets of Houston Drywall's bankruptcy estate, and therefore, only those creditors granted relief from the bankruptcy stay may proceed.

¶ 8 After reviewing the well-reasoned opinion of the Honorable Arthur R. Tilson, I conclude it adequately addresses the issues raised by Trevdan. *See* Trial Court Opinion filed 3/20/09. *See also Demharter v. First Federal Savings & Loan Association of Pittsburgh*, 412 Pa. 142, 194 A.2d 214 (1963) (indicating the *right* to pay under a contract is different from the *duty* to pay and only the latter can be enforced by the materialman); *United States Fidelity and Guaranty Company v. United Penn Bank*, 362 Pa.Super. 440, 524 A.2d 958 (1987) (holding corporate surety's payment of unsecured claims of defaulting subcontractor's suppliers would not confer upon surety interest in subcontractor's inventory superior to that of bank which held perfected security interest in inventory); *Himes v. Cameron County Construction Corp.*, 289 Pa.Super. 143, 432 A.2d 1092 (1981), *affirmed*, 497 Pa. 637, 444 A.2d 98 (1982) (holding surety, which issued payment bonds, could not be subrogated to rights of materialman against subcontractor unless and until surety paid materialman's claims for materials sold to subcontractor; that is, *under terms of contract*, contractor did not receive proceeds until suppliers of material were paid, and as between unsecured subcontractor and unsecured creditor, subcontractor had priority); *Kreimer v. Second Federal Savings and Loan Association of Pittsburgh*, 196 Pa.Super. 644, 176 A.2d 132 (1961) (where contract indicated funds *shall* be held for materialman, materialman was a third party beneficiary of the funds); *In re Buono*, 119 B.R. 498 (Bkrtcy.W.D.Pa.1990) (held funds general contractor owed to subcontractor were part of the bankruptcy estate, constructive trusts are to applied sparingly in the bankruptcy context, and attempt to create agreement with materialman constituted improper avoidable preferential transfer). Therefore, I respectfully dissent on this basis.

¶ 9 Trevdan's final claim is that the trial court erred in awarding Toll Brothers any legal fees and expenses since Toll Brothers unreasonably and in bad faith forced Trevdan to file a lawsuit to obtain the monies owed to it. I find no merit to this claim.

¶ 10 As the Majority indicates, 42 Pa. C.S.A. § 2503 provides, in relevant part, the following:

§ 2503. **Right of participants to receive counsel fees**

The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:

\* \* \*

(4) A possessor of property claimed by two or more other persons, if the possessor interpleads the rival claimants, disclaims all interest in the property and disposes of the property as the court may direct.

42 Pa.C.S.A. § 2503(4) (bold in original).

¶ 11 Here, Toll Brothers indicated that, although it was willing to pay Trevdan the monies owed to it by Houston Drywall for supplies, Gulf Coast had made a demand upon Toll Brothers for the same funds. Therefore, unsure as to which company should be paid, and unwilling to face multiple liability, Toll Brothers filed a petition for interpleader requesting the trial court direct to which company payment should be made. By order entered on January 9, 2008, the trial court directed Toll Brothers to pay into court $118,934.00, which represented the amount Toll Brothers owed to Houston Drywall, and discharged Toll Brothers from the lawsuit. On February 1, 2008, Toll Brothers paid into the court the requested amount.

¶ 12 Based on these facts, I conclude the trial court properly awarded Toll Brothers reasonable attorneys' fees and costs pursuant to 42 Pa.C.S.A. § 2503(4). I find no evidence that Toll Brothers unreasonably or in bad faith declined to pay Trevdan in this matter, and to the extent Trevdan continues to argue Toll Brothers should have paid Trevdan on the basis it had priority over Gulf Coast, I disagree for the reasons discussed *supra*.

¶ 13 For all of the foregoing reasons, I would affirm the trial court's order, and therefore, I dissent.